[Crim. No. 2005. First Appellate District, Division One.—September 30, 1938.]

THE PEOPLE, Respondent, v. MAX HICKOK, Appellant.

James Martin MacInnis and Joseph A. Brown for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

KNIGHT, J.—Appellant, a chiropractor, was charged by information with the murder of Mrs. Elizabeth Sowers, who died from the effects of a criminal abortion, which the prosecution claimed had been performed by appellant. Upon trial before a jury he was found guilty of murder in the second degree, and from the judgment of conviction and the order denying his motion for new trial, he prosecutes this appeal. Appellant admitted at the trial that Mrs. Sowers had called at his office twice to see him professionally, but he denied having performed the abortion, it being claimed by him in this respect that when she called the second time she was then suffering a miscarriage. ■ As first ground for reversal appellant contends that the evidence is insufficient to sustain the verdict and the judgment. We find no merit in the contention.

The following are among the material facts appearing from the evidence in support of the prosecution's case: Early in June, 1937, Mrs. Sowers and her husband learned through consulting a regular physician in Oakland that Mrs. Sowers was pregnant about three of four months; and about

a week later, to wit, on Saturday, June 12, 1937, they called on appellant at his office in San Francisco for the purpose of having an abortion performed. They had been referred to appellant by another chiropractor who had refused to perform the operation. After they explained to appellant the purpose of their call appellant agreed to perform the abortion, and thereupon took Mrs. Sowers in another room, made an examination, and packed the uterus; and before Sowers and his wife left the office appellant demanded and was paid a fee of $150. When Sowers protested the amount of the fee, appellant told him he usually charged much more. He then instructed them to return the following Monday morning (June 14th) at 11 o'clock, and upon their arrival at his office at the appointed time he took Mrs. Sowers into an inner room and Sowers was told to wait down in the street in his car. After waiting half an hour he returned to the office and inquired as to his wife's condition and where she was; and he was told by appellant's office nurse that it was unnecessary for him to stay around the office and to go down and wait in his car. At the end of another half hour he returned again and was then told by the nurse that appellant had just stepped out and that Mrs. Sowers was sleeping and resting; so he went back to his car again, and after waiting another half hour he grew much alarmed, and returning to appellant's office demanded to see his wife and also appellant. The nurse finally left the reception room and returned with appellant, and when Sowers asked as to his wife's condition appellant said that she would require an appendicitis operation. Sowers replied that she had never suffered from appendicitis, that she had always been healthy; and he insisted on seeing her; whereupon appellant took him across the hall into room 309 which was not identified or connected with appellant's regular suite of offices (numbered 306, 307 and 308). There Sowers found his wife lying on a couch suffering excruciating pain, and he detected the odor of ether. Appellant then told him that he would have to keep Mrs. Sowers there for two or three days and Sowers replied "Keep her in a place like this?", and appellant said no, that he had a private hospital around the corner and he would place her there. It was then about 1 o'clock in the afternoon and appellant told Sowers to go home and re-

turn there at 7 o'clock that evening. Shortly after Sowers left appellant took Mrs. Sowers in a taxicab to St. John's Hospital, but upon their arrival there Mrs. Sowers' condition was such that the hospital attendant had difficulty in obtaining from Mrs. Sowers her name, age and other data; and when appellant was asked to give his name he stated he wished to see Dr. Morton (the head of the hospital) personally. Thereupon Mrs. Sowers was sent to a room, and after appellant made arrangements with Dr. Morton to accept the patient, he paid the hospital $100 in currency toward hospital expenses, and agreed to pay whatever balance there might be. Dr. Morton asked appellant what was wrong with the patient, and he replied he thought she was having a miscarriage, that he had found a catheter in her vagina. Dr. Morton proceeded at once to operate, and after the catheter had been removed Mrs. Sowers was found to be in a horribly mutilated condition. The foetus had been shoved up in the abdominal cavity behind the liver; the left arm had been torn off but was not found in the vagina; her uterus had a large laceration in it allowing the large bowel to come through, and there was a fresh cut twelve inches long in the bowel. As the result of the surgical treatment given by Dr. Morton and aided by several blood transfusions Mrs. Sowers rallied for several days, but on June 21st she died. An autopsy disclosed that death was due to blood poisoning, the infection having been carried into the uterus from the bowel and by unsterilized instruments. No traces of appendicitis were found.

On the same day that Mrs. Sowers entered the hospital, Dr. Morton reported the case to the police department, and police inspectors were sent to appellant's offices. Upon entering rooms 306, 307 and 308, which were advertised as appellant's suite, they found nothing incriminating, but upon gaining entrance to the undesignated room across the hall (number 309) they found complete surgical equipment for performing abortions, including operating tables, curets, catheters, dilators, forceps, speculums and other equipment. They also found soiled sheets and towels, some of which were bloodstained. That same night they interviewed Mrs. Sowers, and obtained from her a written statement as to what happened in appellant's office that day, wherein she stated, among other things, that appellant had operated on her;

that after placing her on the operating table, he operated with instruments, curetted her, and left the catheter in her. Appellant learned that night that the police had visited his offices, and the next morning he reported personally at police headquarters; whereupon he was taken to the hospital to be identified by Mrs. Sowers. On the way there the police inspectors read Mrs. Sowers' statement to him, and asked if he had anything to say regarding the charges made therein; and although he stated in reply that he refused to make any statement, he admitted in response to further inquiries that he had rented room 309 and that the surgical equipment found therein was his; also that Mrs. Sowers and her husband had come to him to have an abortion performed; furthermore he admitted having consulted with Mrs. Sowers and her husband on Saturday, June 12th, and having told Sowers on Monday to return that night at 7 o'clock; but he denied having performed an abortion or having been paid any money; and he refused to answer most of the other inquiries. At the hospital, after Mrs. Sowers had identified appellant, she repeated in appellant's presence what she claimed had happened in his office Monday June 14th, and again stated that he had operated with the aid of instruments and left a catheter in her vagina. Appellant made no comment at the time, but on the way back to the police station he was asked if he had anything to say as to the charges made by Mrs. Sowers, and he replied that he had been advised by counsel not to make any statement. He did say, however, according to the inspectors, that he "was not such a bad fellow", that he brought Mrs. Sowers to the hospital and provided her with two nurses; that he got his "neck into it" and did the best he could. That same night appellant told a Miss Zeh, who had acted as his office attendant on Saturday. June 12th, that it was an "awful mess", and he was sorry it happened. The next day, June 16th, Mrs. Sowers swore to a criminal complaint charging appellant with having performed the abortion on her; and on Friday, June 18th, appellant sought to have Sowers sign a statement before a notary to the effect that appellant had not performed the abortion nor recommended anyone to perform it, but that Mrs. Sowers herself had performed it. Sowers, however, refused to sign such a statement, saying it was not true.

At the trial appellant in support of his claim that he had not performed the abortion testified that he was not in his office on Monday morning, June 14th, at which time it is claimed the abortion was performed; that he spent the morning visiting his mother and having a chiropractic treatment and lunch with another chiropractor; and his testimony in this respect was corroborated by the testimony of his mother and said chiropractor. But in contradiction of the asserted alibi the elevator man of the building wherein appellant's offices were located testified that appellant had gone up in the elevator to his office that morning, and that he had not seen him come down; furthermore, an inspector of police testified that when he interviewed appellant's mother on June 15th she said she had not seen her son in over two months. However, apart from the above conflicting testimony, appellant admitted having gone to his office after lunch on June 14th and having found Mrs. Sowers and her husband awaiting him; and his story of what happened was this: He stated that Mrs. Sowers said she was having some difficulties and he told her he would see what could be done; that he took her into room 309, placed her on an operating table and upon examining her found a plug of cotton and a rubber catheter in the vagina; that he removed both, and saw something protruding from the dilated cervix; that he thereupon replaced the catheter and inserted another plug of cotton. When asked his reason for reinserting the catheter he replied that it "was the one and only piece of evidence" he had that Mrs. Sowers or someone else "had done it", and that he "most certainly was not removing that". Continuing, appellant testified that he then went back to the reception room and told Sowers his wife was in a serious condition and should be sent to a hospital. The explanation offered by him for having possession of the surgical instruments was that they had been pledged with him by a doctor friend as security for the payment of a loan.

As indicated by its verdict, however, the jury did not believe appellant's story that he had not performed the abortion; and the evidence introduced by the prosecution shows abundant justification for the rejection of his story. Part of such evidence consisted of medical proof that it was impossible for Mrs. Sowers to have thus terribly mutilated

herself. Furthermore, it was shown that some of the surgical instruments found in room 309, in which appellant admittedly examined Mrs. Sowers, were stained with human blood; and that all of said instruments were of the type used in performing abortions at any stage of pregnancy; also that a chiropractor is prohibited from using any such instruments in the practice of his profession. Moreover, appellant while testifying as a witness in his own behalf admitted that he had performed abortions before and that the blood-stained sheets and towels found in room 309 had been used by him in performing such an operation; but in this connection he claimed that he had performed these abortions at another place, the last one about two months before Mrs. Sowers called at his office; and he went on to say that he stopped performing abortions at that time because of a visit from the police, who told him they suspected him, and that while "they had nothing definite on" him at the time, they were going to see that they did get something. It would seem to require no discussion to demonstrate that when the foregoing facts and circumstances are added to those already set forth, the case made out by the prosecution is amply sufficient to sustain the conclusion reached by the jury as to appellant's guilt.

 Appellant argues that Sowers was an accomplice and that his testimony was not corroborated in the manner required by section 1111 of the Penal Code. In this connection respondent concedes that Sowers was an accomplice; and in fact the jury was so instructed; but the record shows that his testimony formed but a small part of the evidence upon which the judgment of conviction is based. It related more particularly to the conversations he had with appellant at his office; and it is quite evident that even without Sowers' testimony the other evidence presented by the prosecution would be legally sufficient to sustain the conviction. However, in any event, the record clearly refutes appellant's contention that the requirements of said code section were not met. In presenting this point appellant seems to argue that it is necessary that the accomplice be corroborated in all the essential elements of the offense. But such is not the law. To the contrary, it is held to be sufficient if the corroborating evidence, considered by itself, merely tends in some way to connect the defendant with the commission

of the crime (*People* v. *Thompson*, 16 Cal. App. 748 [117 Pac. 1033]); and as said in *People* v. *Tinnin*, 136 Cal. App. 301 [28 Pac. (2d) 951], although more is required by way of corroboration than to raise a mere suspicion, yet the corroborating evidence is sufficient if, notwithstanding it may be circumstantial and of itself entitled to but slight consideration, it of itself tends to connect the defendant with the commission of the offense (*People* v. *Lee*, 81 Cal. App. 49 [252 Pac. 763]; *People* v. *Watson*, 21 Cal. App. 692 [132 Pac. 836]; *People* v. *Thompson*, *supra;* *People* v. *Negra*, 208 Cal. 64 [280 Pac. 354]). It is also held that a defendant's own conduct, and the statements and admissions made by him in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. (*People* v. *Negra*, *supra*, citing *People* v. *Armstrong*, 114 Cal. 570 [46 Pac. 611], and *People* v. *Sullivan*, 144 Cal. 471 [77 Pac. 1000].) Therefore, in the present case, we need go no further in pointing out corroborating evidence tending to show that appellant performed the abortion than to refer to his conduct after he had surrendered to the police, and to his own testimony wherein he made many incriminating statements and admissions. But there is much more corroborating evidence; and while we shall not enumerate all of it here, reference may be made to the circumstances under which appellant took Mrs. Sowers to the hospital and left her there, including his statements to Dr. Morton concerning Mrs. Sowers' condition; the fact that he had performed other abortions; the presence in room 309, wherein he admitted having taken Mrs. Sowers for examination, of bloodstained abortion instruments and blood-stained sheets and towels; his statement to Miss Zeh; and the manner in which he conducted himself in the face of accusatory statements. Without going into greater detail, it may be said generally that the corroborating evidence here produced was equally as strong, if not stronger, than that produced in *People* v. *Thompson*, *supra*, and *People* v. *Collins*, 4 Cal. App. (2d) 86 [40 Pac. (2d) 542], wherein the convictions were sustained. No claim is made by the prosecution, as appellant seems to believe, that the testimony given by the regular physician from Oakland, who was called as a defense witness, served as corroborating evidence; consequently appellant's lengthy discussion concerning it requires no comment.

Appellant attacks the credibility of certain witnesses, including Sowers; and as opposed to their testimony he stresses certain points in the evidence which he claims were developed by the testimony for the defense. ■ The answer to this contention is that all matters going to the credibility of witnesses and to the weight of their testimony, as well as all questions of conflicting evidence, must be left to the determination of the jury. (8 Cal. Jur., p. 583.)

As further ground for reversal appellant assigns as error some eight or more of the trial court's rulings on the admissibility of evidence. Each of said assignments has been discussed in detail by respondent in its brief; and in our opinion respondent has therein fully and satisfactorily answered all of appellant's contentions respecting the rulings of which he complains; and to repeat here what respondent has there said would only unnecessarily lengthen this opinion. Therefore, suffice it to say, for the reasons and upon the grounds set forth in respondent's brief, we find that none of said rulings calls for a reversal.

■ Nor can we agree with appellant's contention that under the facts of this case the trial court committed error in not instructing the jury that a verdict of manslaughter might be returned. Quite to the contrary, the law is well settled that in cases of criminal abortion, wherein, as here, the defendant rests his defense simply upon a denial that he performed the abortion, no element of manslaughter enters into the case, and the court's instructions should go only to murder in the second degree, and the verdict should be either guilty as charged or not guilty. (*People* v. *Wright,* 167 Cal. 1 [138 Pac. 349]; *People* v. *Huntington,* 138 Cal. 261 [70 Pac. 284]; *People* v. *Balkwell,* 143 Cal. 259 [76 Pac. 1017]; *People* v. *Northcott,* 45 Cal. App. 706 [189 Pac. 704].) Appellant frankly concedes that such is the rule declared and adhered to in this state, but he assails the soundness of the decisions declaring such rule. We have found nothing in the argument advanced by appellant in this behalf which would warrant a departure from the established rule.

■ Appellant next urges that the trial court erred in denying his motion for new trial, which was made on the ground of newly discovered evidence and supported by three affidavits. One affidavit was made by a laundryman, the second by an expressman, and the third by appellant. In this be-

half appellant contends that the facts averred in the first and second affidavits tend to support the testimony given at the trial by himself and his nurse to the effect that the blood-stained sheets and towels found in room 309 were soiled long before June 14th; and he argues, therefore, that if the testimony of those affiants was produced on new trial a different verdict would be returned. We cannot agree with appellant in this regard. The affidavit of the laundryman simply averred in effect that he had not done any laundry work for appellant since the end of May; and the affidavit of the expressman averred that on May 28th he had moved appellant's belongings, including a large quantity of soiled towels and linens, from appellant's former office to 101 Post Street. This evidence, it will be noted, is not directly connected with the soiled sheets and towels in question; but even construing the facts averred in said affidavits according to appellant's view, the most that can be said for the newly discovered evidence would be that it would merely give some support to appellant's story, and hence would be cumulative and only add to the present conflict. Furthermore, no sufficient reason was disclosed why the evidence could not have been produced at the present trial; and in any event, the question of whether the evidence produced on the motion was such as to render a different result probable was one peculiarly addressed to the discretion of the trial judge, and unless there is manifested a clear and unmistakable abuse of such discretion, its ruling on the motion will not be disturbed on appeal. (8 Cal. Jur., pp. 442, 443.) We find in the present case no such abuse of discretion.

We have given no consideration to the matters set forth on pages 135 to 172 inclusive of appellant's opening brief for the reason that subsequent to the filing of said brief and prior to the oral arguments on the merits of the appeal, it was stipulated that those portions of the brief be stricken out and disregarded, and an order was made accordingly. The remaining points raised by appellant are merely incidental to those already discussed and determined.

After having examined the entire record, including the evidence and all contentions made in behalf of appellant, it is our conclusion that no ground for reversal has been established, and that the verdict has not resulted in a miscar-

riage of justice. The judgment and order appealed from are therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 15, 1938.