[Crim. No. 4747.   Second Dist., Div. Three.   Apr. 22, 1952.]

THE PEOPLE, Respondent, v. CLIFFORD JONES MORRIS et al., Defendants; PAUL R. DeGASTON, Appellant.

470

Everett W. Leighton and Lionel Richman for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendants Morris and DeGaston were accused of the crimes of abortion and conspiracy to commit an abortion. During the trial by jury the information was dismissed as to Morris, and he was called as a witness by the plaintiff. DeGaston was convicted on both counts. He appeals from the judgments and the order denying his motion for a new trial.

Appellant contends that the evidence was insufficient; the corpus delicti as to each charge was not established; there was no corroboration of the testimony of the woman; and the court erred in receiving certain evidence and in giving an instruction. He did not testify and did not offer any evidence on his behalf.

Mrs. Malmgren, who resided in San Francisco, wanted an abortion performed upon herself. A friend in San Francisco telephoned to defendant Morris, an osteopath in Glendale, and asked if he would see a Mrs. Baker if she came to his office. The friend gave Morris' telephone number to Mrs. Malmgren and told her to use the name, Mrs. Baker. She testified as follows: She had missed two menstrual periods and believed she was pregnant, but otherwise she was in good health. She went to Glendale on February 7, 1951, called Morris by telephone about 12:30 p. m., and made an appointment to be in his office at 1:30 p. m. When she arrived at the office she introduced herself as Mrs. Baker, and told him that she had missed two menstrual periods, she believed she was pregnant, and she wanted something done about it. He said he could not do anything. While they were talking, Morris left the room several times. The telephone, in another room, rang several times while she was there. De-

Gaston arrived at Morris' office about 2 p. m. and Morris introduced him as "Dr. Paul." Morris left the room, and she told DeGaston the same thing she had told Morris regarding her condition. DeGaston said that he did not want to have anything to do with it. She said she had come from San Francisco because she could not find anyone there who would do anything about it, and if she could not find someone who would do something she would attempt to do something herself. DeGaston then said that he would examine her, and told her to come with him. They left Morris' office and entered a Packard automobile which DeGaston drove to an apartment house in Hollywood. After he had parked the automobile, he told her to follow him, within five or ten minutes, to room 402 of that house. She remained in the automobile as directed and then went to said room. DeGaston was there. They "arrived at a figure of $300," and she paid that amount to him. They had some drinks. A kitchen table, which was against the wall, was moved out by appellant, and he placed two chairs at one end of the table. She took her underclothing off and reclined upon the table—placing one foot on one chair and one foot on the other chair. Her head was upon a pillow. He gave her two pills and she swallowed them. She saw a hypodermic needle while he was filling it from a capsule which was labeled "Novocain." He gave her a shot of novocain in the region of her vaginal organs. While he was waiting he boiled something in a pan on the stove, but she did not see what was in the pan. After the boiling, he conducted the examination. She could not see what he was doing, but she felt pain where he was examining her. She did not see, hear or feel any instrument except that she saw and felt the needle and she felt paraphernalia of some sort inside her vagina. During the operation, which took about 15 minutes, he asked how she was feeling. At the conclusion of the operation, about 3:30 p. m., he gave her a shot of penicillin, gave her a sanitary pad, told her to be comfortable, not to be active for a few days, and she probably would begin to menstruate in about six weeks. Then she lay upon the davenport in his apartment about two hours. After the examination he played the violin. They left the apartment about 6 p. m., and he took her in the Packard automobile to dinner and then to her hotel. She began to menstruate about six weeks after the examination.

Morris testified that Mrs. Malmgren came to his office about noon on said February 7th and introduced herself as Mrs.

Baker; he called DeGaston by telephone twice on that day; DeGaston called him about noon on that day; after Mrs. Malmgren arrived at his office and told him that she was pregnant, he called DeGaston by telephone and told him to come over and get his patient; Morris knew DeGaston under the names of Hoisch and Marsh; DeGaston came to the office and Morris introduced him and said, "Here is your patient, Mrs. Baker."

The manager of the Glendale office of the telephone company testified, by referring to records of the company, that on said day telephone calls were made from Morris' telephone to DeGaston's telephone at 1:14 p. m. and 2:01 p. m.

Dr. Roberts, a physician, testified that on February 8th he examined the pelvis and vagina of Mrs. Malmgren; her uterus was enlarged approximately to the size of six or eight weeks' pregnancy; there was an appearance of trauma in that the endocervix showed some scraping off of the soft surface layers of cells; that in his opinion the injury to the cervix occurred within the past 24 or 48 hours and the injury was consistent with an abortion or attempted abortion; that by disturbing the contents of the uterus with a curette, the patient will usually abort; sometimes when ergot is used the patient will abort; where the uterus has been emptied by curettement, without complications, the average time thereafter when menstruation occurs is about 28 days; novocain could be used to obliterate pain in an operation involving the cervix and uterus; an interuterine tenaculum is used ordinarily to grasp the cervix to facilitate working in the cervix or uterus.

A police officer testified that he had a conversation with appellant on the evening of February 8th in the police station and appellant stated as follows: he had occupied said room 402 since June or July, 1950; on said February 7th he was in bed in said room all day because he had a respiratory illness; he did not have any visitor on said day except his nurse who was there between 7:30 and 8 p. m. The officer asked him if he had gone to Morris' office in Glendale on said February 7th, and he said that he had gone there about 11 a. m. of that day to get vitamin shots. He also said as follows: he had not received any telephone call from Morris on said day; he was not accompanied by anyone when he left Morris' office; he did not see any woman at Morris' office on that day; the only visit he made to that office on said day was around 10 or 11 a. m.; he had never been licensed as a physician.

On February 8, 1951, about 9 p. m., said officer and other officers, accompanied by appellant, entered said apartment 402. The officers found articles therein as follows: ergot aseptic; novocain; and a curette and an interuterine tenaculum which were in a fabric zipper case. They also found three empty novocain tubes in the incinerator in the basement of the apartment house, which tubes were similar to the novocain tubes found in appellant's apartment. The officer (witness) saw a Packard automobile, which was registered in appellant's name, on a parking lot across the street from the apartment house.

On the next day, February 9th, the said officer, three other officers, appellant, and Mrs. Malmgren were in appellant's apartment. The officer (witness) asked appellant if he had seen Mrs. Malmgren before that time, and he said he had never seen her. The officer asked her if she had seen appellant before that time, and she said she had seen him in that apartment on February 7th. He also asked her (in appellant's presence): If appellant had come to Morris' office in the afternoon of February 7th; if she left Morris' office with appellant; if she and appellant traveled in a Packard automobile; if she told appellant, while on the way to the apartment, that she was pregnant and wished to have an abortion; if, as a result of the conversation relative to an abortion, she had paid him $300 for an abortion to be performed by him; and if she had placed herself upon a kitchen table in that apartment and placed her feet upon two chairs at the end of the table. She replied to each of those questions separately, as it was asked, by saying "Yes." The officer also asked her if, after she was in said position on the table, appellant placed instruments inside her body, and she replied that she was not sure because she could not see what was going on, but she felt something that felt like an instrument in her. Appellant did not say anything during that conversation between the officer and the woman. When the conversation with her was finished, the officer asked appellant what he had to say, and appellant remained mute for several moments and then said, "I don't think I better say anything more to you gentlemen until I talk to my attorney."

Appellant contends that the corpus delicti, as to the charge of abortion, was not established. He argues that the prosecution predicated its case upon the use of instruments, that the evidence does not show that instruments were used, or that defendant had knowledge or a belief that the woman

was pregnant, or that appellant had a specific intent to cause an abortion. Instruments and drugs, namely, a curette, a tenaculum, and ergot aseptic, which could be used in performing an abortion, were found in appellant's apartment. She testified that he used a hypodermic needle in giving her a shot of novocain in the region of her vaginal organs; and that he gave her pills. Also, it could be inferred from all the evidence that he used instruments and drugs other than the needle and novocain. There was evidence that after he boiled something in a pan he conducted the examination; she felt pain and paraphernalia of some sort in her vagina; there was some scraping off of the surface of the endocervix; the injury to the cervix was consistent with an abortion having been performed. It could be inferred from all the evidence that he knew or believed that she was pregnant, and that he intended to procure a miscarriage. There was evidence that she told him that she had missed two menstrual periods, that she believed she was pregnant, and that she came from San Francisco to have something done about it; and that he told her, after the operation, that she should not be active for a few days, and probably she would begin to menstruate in about six weeks. The fact as to what appellant knew or believed or intended was, of course, within his knowledge, and it appears that he could reasonably have been expected to explain or deny the evidence presented against him. Under such circumstances, the jury could have considered his failure to testify or to introduce evidence on his behalf as tending to indicate that he knew or believed that she was pregnant, and that he intended to procure a miscarriage. ■ " '[I]f it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.' " (*People* v. *Steccone*, 36 Cal.2d 234, 239 [223 P.2d 17].) ■ It was not necessary to prove that the woman was pregnant. (*People* v. *Ramsey*, 83 Cal.App.2d 707, 717 [189 P.2d 802].) ■ The evidence was sufficient to establish that the crime of abortion had been committed.

■ Appellant also contends that the corpus delicti, as to the charge of conspiracy to commit an abortion, was not established. He argues that there was no evidence that anyone other than the woman had the required specific intent

to commit an abortion. That argument, as to lack of intent on the part of Morris and appellant, is based upon the evidence to the effect that, when the woman told them about her condition and requested that something be done, Morris said he could not, do anything, and appellant said he did not want to have anything to do with it. The evidence shows, however, in addition to those statements, as follows: that Morris did telephone to appellant and tell him to come over and get his patient; that appellant, who was not a physician, went to Morris' office and was introduced by Morris as "Dr. Paul," and Morris said to him, "Here is your patient, Mrs. Baker"; appellant did not disaffirm the false designation of him as a physician or the false surname used in the introduction; he did not disaffirm the reference to her as his patient; he also made several false statements to the officers, including statements to the effect that he had not received a telephone call from Morris on said February 7th, he had been at home in bed all of that day, and he had not seen a woman at Morris' office when he was at that office on said day. The evidence was sufficient to establish that the crime of conspiracy to commit an abortion had been committed.

Appellant contends that, as to both charges, there was no corroboration of the testimony of the woman. ▮ Corroborating evidence must "tend to connect the defendant with the offense," and it "may consist of . . . inferences from the circumstances surrounding the criminal transaction," and "it need not establish the precise facts testified to by the witness whose testimony it supports." (*People* v. *Wilson,* 25 Cal. 2d 341, 347 [153 P.2d 720].) ▮ Corroborating evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the trier of the facts that the witness whose testimony it supports is telling the truth. (See *People* v. *Henderson,* 34 Cal.2d 340, 342, 343 [209 P.2d 785].) ▮ "The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tend to connect the defendant with the commission of the crime." (*Ibid.*) ▮ It is not necessary that the corroborative evidence prove that the defendant is guilty of the offense. (*People* v. *Allen,* 104 Cal.App.2d 402, 413 [231 P.2d 896].) The nature and character of the corroborative evidence required by law are stated in *People* v. *Malone,* 82 Cal.App.2d 54, at page 61 [185 P.2d 870]. The testimony of the woman was corroborated by the testimony

of the officer relative to finding, in appellant's apartment, instruments and drugs which could be used in performing an abortion. ▮ Appellant's possession of such instruments and drugs is substantial corroboration of the woman's testimony. (*People* v. *Raffington*, 98 Cal.App.2d 455, 461 [220 P.2d 967] ; see *People* v. *Powell*, 34 Cal.2d 196, 201 [208 P.2d 974].) ▮ The testimony of Dr. Roberts, who examined the woman after the operation, to the effect that she was pregnant, that the traumatic injury to her cervix could have been caused by an instrument, and that the injury was consistent with an abortion having been performed within the past 48 hours, is corroborative of her testimony. ▮ The several false statements of appellant, indicating his consciousness of guilt, were corroborative evidence. (See *People* v. *Malone, supra,* 82 Cal.App.2d 54, 64.) Her testimony with reference to the charge of abortion was sufficiently corroborated.

▮ Also, her testimony as it relates to the charge of conspiracy was sufficiently corroborated. The testimony of the officer that appellant told him that he had been at Morris' office on February 7th, about 11 a. m., is corroborating evidence. The testimony of the manager of the telephone company, that calls were made on February 7th at 1 :14 p. m. and 2 :01 p. m. from Morris' telephone to appellant's telephone, is corroborating evidence. The false statements made to the officer, indicating appellant's consciousness of guilt, are corroborating evidence. ▮ "Circumstantial evidence suffices for the purpose of corroboration." (*People* v. *Griffin,* 98 Cal.App.2d 1, 26 [219 P.2d 519].) ▮ The testimony of Morris that he telephoned to appellant on February 7th and told him to come over and get his patient is corroborated by the testimony of the manager of the telephone company. As above shown, there was sufficient evidence to corroborate the testimony of the woman regarding the overt acts committed pursuant to the conspiracy.

Appellant also contends that the court erred in receiving the instruments and drugs in evidence. He argues to the effect that there was no evidence that the instruments or drugs were used. ▮ As above shown, the possession of said instruments and drugs is substantial corroborating evidence. The court did not err in receiving this evidence.

▮ Appellant contends further that the court erred in receiving the evidence as to the accusatory statements. He argues that since the officer did not ask for a reply from appel-

lant until the lengthy and complex colloquy between him and the woman had been finished, it is apparent that the purpose in presenting such evidence was not to show the conduct of defendant in the face of accusatory statements but was to place before the jury the alleged fact that instruments had been used. It is not necessary to decide whether this contention is sustainable. Even if it be assumed that the court erred in receiving in evidence the purported accusatory statements and appellant's response thereto, the error does not justify a reversal in view of the strong incriminatory evidence against appellant. The matter of admissibility of accusatory statements is discussed in *People* v. *Simmons,* 28 Cal.2d 699, 711 to 721 [172 P.2d 18].

The contention that the evidence was insufficient to support the judgments is not sustainable.

Appellant also contends that the court erred in failing to instruct the jury regarding the weight to be given expert testimony. Dr. Roberts testified and gave his opinions on medical questions herein. Section 1127b of the Penal Code provides, in part: ''When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: Duly qualified experts may give their opinions. . . . The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion if it shall be found by them to be unreasonable.'' The court should have given an instruction as required by said section, even though appellant did not request such an instruction. The jury was instructed that it was the sole judge of the effect and weight of the evidence, and of the credibility of witnesses. In view of the instructions given, the strong incriminating evidence against appellant, and his failure to testify and explain or deny such evidence, it cannot be said that the error in failing to give the instruction was prejudicial. It appears that the error did not result in a miscarriage of justice. Article VI, section 4½, of the Constitution of California (which provides that no judgment shall be set aside on the ground of misdirection of the jury unless the error resulted in a miscarriage of justice) is applicable here.

The judgments, and the order denying the motion for a new trial, are affirmed.

Shinn, P. J., and Vallée, J., concurred.