[Crim. No. 5677. Second Dist., Div. Two. June 14, 1957.]

THE PEOPLE, Respondent, v. PHILIP V. AMES et al., Appellants.

716

 

 █

Murray M. Chotiner, Russell E. Parsons, Herbert Grossman and Joseph M. Rosen for Appellants.

A. L. Wirin and Fred Okrand as Amici Curiae on behalf of Appellants.

Edmund G. Brown, Attorney General, and James L. Mamakos, Deputy Attorney General, for Respondent.

MOORE, P. J.—Convicted of having aborted nine[1] expectant mothers, defendants Ames and Haskin separately seek to upset the judgments on the grounds of (1) insufficiency of the evidence, and (2) errors in rulings at the trial.

Philip Ames is a licensed osteopathic physician and has practiced his profession in Los Angeles since 1943. He is a graduate in liberal arts from a popular university, and in osteopathy from a college dedicated to that school of thought. He took training at the Los Angeles College of Osteopathic Physicians and Surgeons and interned for a year at the Los Angeles County Hospital. From the incipiency of his practice he has operated alone as a general practitioner and has maintained a well-equipped office on Sunset Boulevard containing rooms with two machines for administering diathermy and two for ultrasonic treatments; two machines for cauterizing, one for making electro-cardiograms, and one for generating X-ray. He is on the staff of a busy hospital and performs the functions of his profession at a number of such institutions. He has drifted into the treatment of women's diseases, specializing in vaginal disorders and obstetrics. In 1954 he rented an office at 8001 Santa Monica Boulevard, several miles nearer the ocean, where he installed a telephone and met patients by appointment. He installed equipment there similar to that in his Sunset Boulevard office.

In February, 1955, there were records of about 2,000 patients at the Sunset office. An employee in both places was his sister, Mrs. Haskin, who figures prominently in the activities under consideration. She worked as a nurse for a salary and checks were issued to her for take-home pay.

---

[1]Mrs. Haskin was convicted on three counts only.

For one year prior to January, 1955, the police department of Los Angeles had Dr. Ames under surveillance. Many reports of his abortion practice had been received. In January a concerted watch was kept over his Sunset office and at times over 8001. During that period, many women were observed entering both premises. Also, Dr. Ames was seen as he visited 8001, but his name did not appear on the door, and he visited it only by special arrangement. Mrs. Haskin was present there at the time of each of the doctor's visits. However, he ordinarily conducted his medical and surgical services at the Sunset office.

On the morning of February 10, police officers took into custody three women as they were leaving 8001 and transported them to the Los Angeles City Hall. There the women confessed that they had been aborted by Dr. Ames with the assistance of Mrs. Haskin. After that fact had been communicated to Officer Zander, he proceeded to the Sunset office and placed Dr. Ames under arrest. Then he made a search of those premises, took possession of a large number of pieces of paper, each containing words in the doctor's handwriting, a $50 check, a piece of stationery and a key. Thereafter, Officer Zander searched the Santa Monica Boulevard office from which he removed a large number of items customarily kept by a physician. Because the officer had no search warrant, no attempt was made to introduce such articles at the trial. Inasmuch as "unreasonable search and seizure" constituted the major portion of the defense at the trial and is now the principal ground for reversal, a discussion of that topic will be deferred until after the "sufficiency of the evidence" has been explored.

## Evidence Sufficient

There is no witness who testified that he saw Dr. Ames abort any one of the women who testified that they had been aborted. Not even Mrs. Haskin admits that the doctor either administered a libation to a patient or used instruments to remove living tissue from a woman's uterus. There is no proof that a foetus was ever seen in his office or that either appellant ever admitted that an embryo had been removed. In the absence of such proof, the State is forced to rely upon inferences reasonably drawn from the circumstances placed in evidence. Ten women testified. Not one of them was impeached. Each apparently regretted having been compelled to take the stand. Not one disliked the doctor or the nurse. They may have feared the consequences of disobeying the subpoena, but

in any event they were believed by the jury and the court approved.

The report of each woman as to the occurrences at the time of her first call on the doctor is of the same pattern: she called at the Sunset premises; filled out a slip of paper; was admitted to the doctor's office; told him she thought she was pregnant; was escorted into an examination room; was given a manual pelvic examination; the doctor told her he believed her to be pregnant; they agreed upon the amount of the fee for the operation; she was told to go to 8001 at a certain time; she called at that address at the designated hour; was admitted to a room where she disrobed; donned a sanitary belt; placed the money on the cot or gave it to Mrs. Haskin; was escorted into another room; lay upon a table; was given "a shot" by Mrs. Haskin and and lost consciousness. Upon regaining her senses in the room where she had disrobed, she found herself equipped with a sanitary napkin and a discharge came from the vaginal tract. Each witness visited Dr. Ames because she thought she was pregnant, and went to his office at 8001 for the purpose of effecting a miscarriage. Each had a restoration of the menstrual period about a month thereafter. In practically every instance the witness believed herself to be in good health. The doctor's charge for the service usually varied between $300 and $450. An increase over the latter sum was measured by the duration of the pregnancy, the anxiety of the patient and her ability to pay.

During January and February 1955, Dr. Ames made examinations at the Sunset office but directed the witnesses to meet him at 8001. At most operations the surgeon did not appear while the patient was conscious, but in the case of Anna Mae she recognized the voice of Dr. Ames when, as he bore her back to the other room, he said: "Put your arm around my neck, honey." Mrs. Haskin subsequently told her that the doctor had carried her. Before visiting Dr. Ames, most of the witnesses had attempted to induce a miscarriage by imbibing castor oil, quinine or other medicinal concoctions, or jumping from an elevation. In each instance after the patient had disrobed preparatory to the operation, she was ordered by Mrs. Haskin to pay the fee prior to the injection about to be applied by the latter. When the nurse had difficulty in finding the vein into which she aimed to give the injection to Patricia, Dr. Ames entered the room to assist her. He kept no case records of the women served at 8001

whereas at the Sunset office he had history charts of more than 2,000 patients.

## MRS. HASKIN ASSISTED

That Mrs. Haskin participated in the abortions of at least three women at the Santa Monica Boulevard office is readily to be inferred from the established facts. Barbara, Jane and Dorothy testified that when they visited the 8001 premises, they met Nurse Haskin; that upon the latter's request they respectively paid her $400, $300 and $400; that they were given no receipts for such sums; that Nurse Haskin administered the anesthetic which rendered them unconscious.

Moreover, she negotiated with and performed the same services for Gaynel, Anna Mae and Patricia at the same office at the times charged in the information.

Ordinarily Mrs. Haskin and Miss Crow were the only nurses employed at the Sunset Boulevard office. However, only Mrs. Haskin worked with Dr. Ames at 8001 and there performed the services above specified for the witnesses.

Facts other than those given in the testimony of the abortees indicate the guilt of the accused. Dr. Ames rented the 8001 premises and paid the landlord her rent. He did not put his name on the door or otherwise display the fact that it was his professional retreat. While he contracted for a telephone for those premises, he kept its number unlisted. Notwithstanding the elaborate filing system in which he maintained detailed records of 2,000 patients at the Sunset office, he kept no similar record of the women who testified that they had been aborted by Dr. Ames, assisted by Mrs. Haskin as nurse at 8001. After Barbara had paid $400 to Mrs. Haskin, the doctor told Barbara the agreed price was $450, and asked her to make a check for $50. It was introduced as Exhibit 20. He gave neither Barbara nor any other confessed abortee a receipt for the fee paid for his services. When Officer Zander told him that he was under arrest for performing illegal abortions, the doctor said, "Well, where?" In reply to the questions of the officer, Dr. Ames stated that he had no office at 8001 Santa Monica Boulevard and that he never visited an office at that location. This false denial indicated a consciousness of guilt on the part of Dr. Ames. ■ Also, it corroborated the testimony of the abortees. (*People v. Malone,* 82 Cal.App.2d 54, 64 [185 P.2d 870]; *People v. Reimringer,* 116 Cal.App.2d 332, 337 [253 P.2d 756]; *People v. Morris,* 110 Cal.App.2d 469, 477 [243 P.2d 66].) Furthermore, Dr.

Ames' failure to keep his usual detailed history charts with respect to the abortees tends to support their testimony. It evinces a conscious desire to conceal evidence of his illicit activities. (*People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720].) ■ The fact that in some instances Dr. Ames bargained with the abortees with respect to his fee is calculated to establish the truth of their testimony. (*People* v. *Smitherman,* 58 Cal.App.2d 121, 123 [135 P.2d 674]; *People* v. *Malone, supra,* page 63.)

His establishment of an unadvertised office; the uniformity of procedure in cases of the witness-abortees; their being directed to meet the doctor at the remote place; the exorbitant charges to young women for only two office calls; his failure to keep case records of the abortees; his giving no receipts—these circumstances taken with the confessions of the unfortunate women and other established facts leave no room for doubt that the corpus delicti of abortion was in each count proved and the evidence was clear that Dr. Ames and Mrs. Haskin were connected with the crimes.

■ The testimony of each of the 10 women is mutually corroborative of the others in that it shows that each abortion was committed in a similar manner and the procedure followed in each instance was the same. (*People* v. *Gallardo,* 41 Cal.2d 57, 64 [257 P.2d 29]; *People* v. *Kendall,* 111 Cal. App.2d 204, 210-211 [244 P.2d 418]; *People* v. *Allen,* 104 Cal.App.2d 402, 411 [231 P.2d 896].)

Insofar as the evidence is concerned, the judgment will not be disturbed. ■ A conviction by the trial court is, in the absence of prejudicial error, final, unless no inference can be drawn other than that the accused is innocent. ■ The reviewing court will not determine the weight of the evidence but will approve the judgment unless it concludes that "under no hypothesis could sufficient facts have been found by the jury to warrant the inference of guilt." (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]. See also *People* v. *Tedesco,* 1 Cal.2d 211, 219 [34 P.2d 467]; *People* v. *Spreckels,* 125 Cal.App.2d 507, 509 [270 P.2d 513].)

## PROBABLE CAUSE

At the commencement of the trial, appellants moved outside the presence of the jury to suppress the evidence on the ground that it was obtained through unlawful search and seizure. Appellants contend that the names of the witnesses and the exhibits had been obtained by police in searching the Sunset office without a search warrant and without probable

cause. At the conclusion of the hearing, the court denied the motion and recalled the jury. The court then stated with reference to probable cause that in his opinion where there is a conflict in the evidence as to the facts on which the officers asserted the right to arrest without a warrant, the defendants are entitled to try the matter to a jury, notwithstanding that such issue had already been tried by the court sitting without a jury. Of course, in the instant action there was no conflict in the testimony of the witnesses called to prove probable cause. No witness contradicted Officer Zander's statements on which he based his belief. After announcing his view of the law, the court further said:

"Now, your representation to the Court at this time that you waive the right to have the matter tried by the jury, at this time, in view of the fact that it was tried by the Court——

"MR. PARSONS: No, we don't waive the right to have it tried by the jury.

"THE COURT: Well, that is what I want to clear up . . .

"MR. CHOTINER: . . . After your Honor rules on the objection, and if the ruling should be adverse to the defendant, then at the proper time we can present such evidence as we might deem appropriate to present the issues to the jury.

"THE COURT: Just so we are clear on what we are doing. You may want to take this matter up, and I want the record clear as to what is going on. Nobody is waiving anything, and the Court is not asking them to."

Later the following occurred:

"THE COURT: . . . Then, at the conclusion proper instructions will be submitted by you and given by the Court relative to the illegal search and seizure.

"MR. PARSONS: That is right.

"THE COURT: And you are at that time to argue it in your argument?

"MR. PARSONS: To the jury . . .

"MR. GROSSMAN: The only thing I am concerned about now, Judge, is that I take it the jury will be fully instructed even though you are overruling the objection, nevertheless it is for their final consideration as to any questions of fact in determining these issues.

"THE COURT: Instructions will be given. That is going to make it difficult.

"MR. GROSSMAN: At the end of the trial.

"THE COURT: At the end of the trial they will be properly instructed, but not at this time. In other words, I presume

you gentlemen have your instructions ready to submit to me, that I will either give or will not give. But in any event, I will give what I believe instructions are adequate to cover the entire subject as near as I can.

"MR. PARSONS: It is our job to help you out."

Thereupon, the abortees severally gave their testimony, identified the exhibits taken from the Sunset office as the information cards they had filled out, or testified that they were similar to those on which they had written for the doctor's use. Also, the women identified (1) the appointment slips which had been received at the Sunset office instructing them when to meet the doctor at 8001, and (2) the instruction slips received by them at that office after they had regained consciousness.

At the conclusion of the testimony of the women, Officer Zander testified that prior to Dr. Ames' arrest he had information that witnesses Patricia, Dorothy and Mary had been aborted by the doctor on February 10 at 8001 Santa Monica Boulevard. Following a colloquy, the court instructed the jury that "This evidence is only on that question of whether or not there was an unlawful search and seizure, and for you to make a determination as to what the true facts are."

Officer Zander testified that he had observed the activities at 8001 from January 30 to February 10 and that he and his fellow officers had observed all but three of the abortees at that address; that he had received information from George Ruppers, investigator for the State Board of Osteopathic Examiners, on several occasions during the preceding two years, also from an investigator for a certain television program and from investigators for the district attorney. ▮ In addition to such intelligence, he had received information about the confessions of Patricia, Mary and Dorothy. This was to the effect that Mary, enroute with the officers to the city hall, related in detail her experience of that morning at 8001 and told the cost of the operation. Similar statements were made to Officer Mitchell by Dorothy and Patricia. He relayed the information to Officer Golinda who in turn related it to Officer Zander near the Sunset office. It was then that the latter placed the doctor under arrest. Every officer who passed on the information of the confessions of the three women on February 10 was a reliable informant (*People* v. *Hood*, 150 Cal.App.2d 197, 201 [309 P.2d 856]), and that information alone was sufficient to give Officer Zander probable cause for making the arrest.

In line with their running general objection, appellants

moved to strike as hearsay all the testimony received with reference to probable cause. The court had promptly reserved its ruling and appellants moved for a mistrial on the ground that the admission of hearsay evidence was violative of appellants' constitutional rights. Such motion having been submitted, was denied prior to the close of the trial.

## WHOSE ERROR?

The contention that the court committed prejudicial error in denying the motions to strike the evidence and to grant a mistrial is without support. In the first place, the identical problem was determined in the court's trial in chambers of the question of probable cause. That decision was correct. (Pen. Code, § 836, subd. 3; *People* v. *Soto,* 144 Cal.App.2d 294, 298 [301 P.2d 45]; *People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535].) ■ But it would have been error to submit this question to the jury had it not been for the consent given by both sides. (*People* v. *Silvestri,* 150 Cal.App.2d 114, 117-118 [309 P.2d 871]; *People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469]; *People* v. *Lawrence,* 149 Cal.App.2d 435, 447 [308 P.2d 821].) In the Silvestri decision, the appellate court supported its holding by citing *People* v. *Gorg* and said that the trial court should have determined the question as a matter of law. ■ But, as previously shown, the submission of this matter to the jury in this case was pursuant to appellants' demand.

Now, what did Officer Zander tell the jury about his information that was prejudicial to appellants? He testified that (1) he had observed activities at the Santa Monica Boulevard office "for the days preceding the 10th"; (2) he had the information received from the Board of Osteopathic Examiners "in the preceding two or three years"; (3) he had information from Mr. George Ruppers (*supra*); (4) he had "information from the District Attorney investigators as far back as five years." In addition to the foregoing, Officer Zander had the confessions of three of the aborted women given to his fellow officer working on the identical matter. Had the jury tried only the question of probable cause, they could have concluded not otherwise than that Zander's arrest of Ames was justified by reason of the confessions of the three women, and if the case were tried again, it must be conceded that the same result would follow the jury's consideration. Therefore, how can it be said that appellants suffered any prejudice by the recitals of the officers

of what had been told them by reliable informants? Moreover, the same women who had confessed to Officers Mitchell and Bates testified to the same facts as witnesses for the People on the question of the guilt or innocence of the defendants. The conclusion is unavoidable that the jury was impressed by this testimony and that no prejudice to the defendants resulted from Zander's summary thereof on the question of probable cause.

That the testimony of the abortees was amply corroborated and that the verdicts would have been the same had the jury not heard the evidence on probable cause is clearly demonstrated by reference to a few exhibits and to Dr. Ames' attempted explanation in reference thereto. At the lower edge of most of the information slips were notations in turquoise ink such as: "5w-3-5-" or "5-4-100." Dr. Ames admitted that such notations were in his own handwriting.

Florence testified that she went to the Sunset office on January 3, filled out a slip, received a pelvic examination, was informed she was pregnant and the fee for curettement would be $350. On January 16 she went to 8001 with $300 cash which she laid on the cot where she was undressing. She was then escorted to another room, given a hypodermic injection by the nurse and lost consciousness. Upon regaining consciousness, she wore a sanitary napkin and later had a bloody discharge from the vaginal tract. She testified that on about January 28 she mailed $25 to Dr. Ames. An envelope postmarked January 29, addressed to Dr. Ames at the Sunset office, marked "PERSONAL AND CONFIDENTIAL" bore Florence's return address. (Exhibit 18.) Officer Zander testified that such exhibit was seized in the search of the Sunset office. Florence identified it as the envelope in which she had mailed the money. At the bottom of her information slip (Exhibit 17) was the following notation: "6-7w = 350-pay 3 — 50 later." On the reverse side in the same ink was the following: "1-31-55-pd-25⁰⁰ bal 25⁰⁰." After admitting the notations were in his handwriting, Dr. Ames gave the following explanation: "Well, off-hand I cannot say definitely, but I imagine it would mean that there were six or seven weekly treatments that she needed at $3.50 a treatment and all she could pay, all she had paid was $3.00 a treatment. I don't know." He denied that the notation meant "six or seven weeks pregnant, $350.00, paid $300, $50 later." With respect to the notation on the back he was asked: "Is that a memo of her having paid $25.00?" To

which he replied: "It looks like it. It possibly is. She did pay me $25.00." The flagrant falsity of this explanation is demonstrated by simple arithmetic. Seven weekly treatments at $3.50 would amount only to $24.50. Yet the physical evidence alone shows payment of $25 with a balance due of $25. This false explanation disclosed a consciousness of guilt and is legal corroboration of the witness.

One more example will suffice. Barbara testified that after filling out an information slip (Exhibit 19) at the Sunset office, she was given a pelvic examination by Dr. Ames. He told her she was three months' pregnant and that the price would be $450. On January 30 Barbara appeared at 8001 and had a conversation with defendant Haskin who told her to disrobe, and asked for the money. Barbara handed Mrs. Haskin $400 in $50 bills, whereupon Mrs. Haskin went into another room and returned with Dr. Ames who reminded Barbara that the price was $450. When she repeated her inability to get all the money, he asked whether she had a personal check. Whereupon Barbara wrote out a check for $50 payable to cash and handed it to either Dr. Ames or Mrs. Haskin. Barbara identified Exhibit 20 as the check, and Officer Zander identified it as having been seized in the search of the Sunset office. At the bottom of Barbara's information slip appears the following: "3m-45-." Thereafter, in a different ink written with a different pen appears: "owe 50.00 left ck." Dr. Ames testified both notations were in his handwriting. He had no definite recollection of what the notations meant but denied that they stood for "three months' pregnant, $450.00, owes $50.00, left check." He had no explanation of why the check dated January 30 and seized February 10 had not been cashed sooner.

There were other similar instances concerning which Dr. Ames either gave no explanation of the notations, or resorted to the fiction of weekly treatments at $3.00 or $3.50 each. Many appointment slips[2] given to the abortees were in evidence, all bearing Dr. Ames' notations in the familiar tur-

---

[2] 'ADDRESS . . . 8001 SANTA MONICA BLVD. (2 blocks W. of Fairfax.)
IMPORTANT . . . please call if you are not able to keep appointment.
Please try to be earlier than appointment.
Please do not eat 6 hours before coming.
Please Douche before coming.
Please bring Sanitary belt and pads . . . these are absolutely necessary.
Plan to stay about 1 hour. Someone can pick you up.
TIME_____ DAY_____,'

quoise ink, indicating the day and hour of their appointments at the 8001 office. ■ The requirement of douche, sanitary belt and sanitary pads is corroborative of the abortees' testimony that they went to 8001 for the purpose of effecting an abortion. The requirement that they were not to eat for six hours before arriving is corroborative of their testimony that they received an anesthetic.

Equally significant and corroborative is the instruction sheet[3] given to each abortee after regaining consciousness, particularly the forecast of menstruation in four to six weeks. Each of the women testified that her normal period was resumed as promised.

In addition to the overwhelming physical evidence connecting appellants with the crimes in such a manner as to indicate the abortees were telling the truth, it is now well settled "that there is sufficient corroboration if the independent testimony of the women shows that each abortion was committed in a similar manner." (*People* v. *Gallardo,* 41 Cal.2d 57, 64 [257 P.2d 29], and cases cited therein.) Such is the situation in the matter at bar.

■ Taking the case, all in all, it is clear that there was no miscarriage of justice. That result in any trial may be declared "only when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) ■ In view of the fact that appellants practically demanded that the court submit the question of probable cause to the jury and the evidence possessed by arresting officers and the probability that a retrial would necessarily result in the identical decision, it must be held that no prejudicial error resulted from the recitals of the

---

[3]"ALL THIS IS NORMAL

1. You may have no spotting or discharge or flow.
2. You may have some spotting or discharge until your next period.
3. You may have some slight cramps.
4. You will menstruate in 4-6 weeks.
You may eat anything you wish now.
Do not lift anything heavy for one or two weeks.
Rest or take it easy for one or two days.

NOTIFY DOCTOR OF THE FOLLOWING SIGNS

1. Severe hemorrhage, more than heavy menstrual period.
2. Fever
3. Severe cramps."

officers concerning the origin of their information that gave them probable cause to make the arrest of Dr. Ames.

The same is true as to the arrest of Mrs. Haskin. While the testimony of an abortee involved Nurse Haskin in the performance of each abortion, yet her daily life about the doctor's office and her efficient service in waiting upon the patients and in serving the doctor could leave no doubt that she was justifiably convicted of Counts II, IV and VIII under which the abortees named testified that Mrs. Haskin had collected from them the moneys which the doctor had at first demanded as the price each should pay him to effect an abortion.

Appellants contend that prejudicial errors followed the rulings that the People's witnesses might testify (1) to the purpose of their going to the 8001 office and (2) to their beliefs that they were pregnant. ·No error was committed in permitting such evidence. ▮ Testimony of a woman as to her having gone to the doctor for the purpose of obtaining an abortion is admissible as bearing on the defendant's intent. (*People* v. *Ramsey*, 83 Cal.App.2d 707, 723-724 [189 P.2d 802].) ▮ While pregnancy is no longer an issue in an abortion case in view of the deletion of such requirement from Penal Code, section 274, by the 1935 amendment, it is a circumstance which may be proved, if it exists. (*People* v. *Califro*, 120 Cal.App.2d 504, 514 [261 P.2d 332], hearing denied, certiorari denied, 347 U.S. 959 [74 S.Ct. 708, 98 L.Ed. 1103].)

▮ One further matter deserves attention. At the time of instructing the jury, at the request of the People the court read the following:

"You are instructed that the testimony of the woman upon whom the abortion was alleged to have been performed, if believed and meeting the requirements of the laws herein stated, is insufficient without corroboration to prove that the crime was committed. The corroboration required by law is such corroboration as tends to connect the defendant with the commission of the alleged crime as is further stated in my instructions."

When the jury returned to court for additional instructions, the court read the following:

"The elements of the crime of abortion known as corpus delicti, namely, the use of some means by an individual with the intent to procure a miscarriage upon a woman, not necessary to preserve her life, may be shown by the testimony of

the woman upon whom such act was committed without being corroborated by other evidence.''

The instruction was correct. Section 1108 of the Penal Code says: ''the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence.'' This is not contrary to the instruction which refers to the corpus delicti. Surely an abortee may prove the crime itself by her own testimony. It is only when she testifies to the connection of the accused with the crime that she must be corroborated in order to justify conviction. (*People* v. *Malone*, 82 Cal.App.2d 54, 61 [185 P.2d 870]; *People* v. *Sullivan*, 113 Cal.App.2d 510, 524 [248 P.2d 520]; *People* v. *Hickok*, 28 Cal.App.2d 574, 580-581 [83 P.2d 39].)

The judgment is affirmed.

Ashburn, J., concurred.

A petition for a rehearing was denied July 9, 1957, and appellants' petition for a hearing by the Supreme Court was denied August 6, 1957. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.