[Crim. No. 2906. First Dist., Div. One. Oct. 1, 1953.]

THE PEOPLE, Respondent, v. LENA CALIFRO et al., Appellants.

Henry J. Kleefisch, Reed M. Clark and Nathan C. Coghlan for Appellants.

Edmund G. Brown, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—Defendants Lena Califro and Andrew Mareck appeal from judgments of conviction of conspiracy to commit abortions and of committing abortions, and from the orders denying their motions for new trial.

## QUESTIONS PRESENTED

1. Sufficiency of the indictments as to the conspiracy charges.

2. Sufficiency of evidence, particularly corroboration as to Lena.

3. The admission of evidence (a) of pregnancy; (b) reference to an abortion in 1939; (c) of Andrew's confession.

4. Correctness of the denial of Lena's motion for separate trial.

## RECORD

Two actions were consolidated for trial. In the first action the indictment charged Andrew Mareck, Alice Mareck (his wife), Lena Califro (his mother), and Elliot Toor (a druggist) in the first count, with the crime of conspiracy to commit abortion, in the second count with committing abortion on one Ann. Prior convictions of burglary, robbery and first degree murder were alleged against Andrew. In the second action, which did not include Toor, the indictment charged the other three defendants, in count 1, with conspiracy to commit abortion; in count 2 with abortion on one Sylvia; in count 3 with abortion on one Betty, and in count 4 with another abortion on Betty. The above mentioned prior convictions were again alleged against Andrew. Andrew denied all prior convictions. On motion of the district attorney, one of the prior burglary convictions was dismissed. Lena moved for severance and a separate trial. Her motion was denied. During the trial Alice changed her plea to guilty. The jury found all three remaining defendants guilty on all counts charged against them respectively. It also found that Andrew had suffered the prior convictions as alleged.

## EVIDENCE

The evidence of guilt of all defendants is overwhelming, and does not require setting forth in detail.

*The Ann Count.*

Ann testified that when she found that she was pregnant she went to Toor's drugstore and talked to him about an abortion. He told her to see Lena, giving the address, and suggested that she return to him after seeing her. Ann went to Lena's home, and told her Toor had sent her and that she wanted an abortion. Lena stated one would cost $300 or $350, and that she could arrange it for that night or the next day; that it would take place outside of San Francisco. Lena made a long distance call. Lena then gave Ann a piece of paper with her name, ''Dr. Lena,'' and phone number written on it, and asked Ann to phone her as soon as she had the money and could go. Ann returned to Toor and related her conversation with Lena. Toor said that for $20 he would give Ann pills which would abort. Ann paid Toor and received the pills. As they did not accomplish results, Ann returned to Toor in four or five days, and reported their nonsuccess. Toor then told her that she should go through with the abortion as planned by Lena. Ann called Lena, who told her to go to Marysville, taking a nightgown, slippers, robe and money, and that she would be met in front of the P.G.&E. building there by a woman to whom she was to identify herself.

As planned, Ann met Alice Mareck in Marysville. Alice took her across the street to an auto where Andrew was waiting. Andrew drove them to a house in Brown Valley, about 15 miles from Marysville, where Mrs. Mareck wrote down certain personal data obtained from Ann and was paid $350. This writing was later found on the premises by the police. Mrs. Mareck led Ann to a room or porch in which there was a table covered with a sheet. Here Andrew performed the abortion. Ann remained in bed there overnight. One Eppler corroborated Ann's testimony as to the first conversation with Toor and stated that he had taken Ann to Lena's house, using a diagram which he had made from Toor's directions as to the location of the place. He heard Toor make a phone call asking if it was all right for Ann to go to the house, although he did not hear any name mentioned on the phone. Inspector Nelder of the San Francisco Police testified he and other officers went to the Brown Valley house to arrest the Marecks. They told Mareck that they were there to arrest him, that they had spoken to a girl in San Francisco. Mareck said a girl had been there over the week end but she came up to buy narcotics. Nelder said he was going

to search the house for "the tools." Mareck said, ". . . 'I will give you the tools.' " He then led Nelder to a grip and in handing it to him said, " 'The tools are in here.' " The grip contained surgical instruments commonly used in performing abortions. Later Mareck told the officers that he aborted the girl, saying he received $350 for doing it. At San Francisco Mareck signed a written confession to Ann's abortion.

Toor's story was that he had given Ann a prescription of ergoapiol after being authorized by a physician by phone to do so. He had given Eppler the address of Lena's home but only for the purpose of Eppler's seeing Thomas Califro, Lena's husband, an attorney, who was there sick, to obtain legal advice. Eppler admitted that Toor had referred him to Thomas for legal advice but stated that that was only part of the conversation.

Lena admitted that Ann had come to her home asking help in obtaining an abortion, but that she told Ann not to bother her as she did not wish to get mixed up in Ann's affairs. Lena's husband corroborated Lena's version of the visit. Lena admitted that the handwriting on the slip of paper containing her address and phone number which Ann testified Lena had given her, was in her own handwriting, but claimed that somebody had taken it out of the wastebasket or some other place. Andrew testified that his wife, Alice, and another man were doing abortions, and that the bag of tools was put in his closet by her. He denied all.

### The Sylvia Count.

Sylvia testified that finding herself pregnant she went to Lena's home and talked to her. Lena told her an abortion would cost not over $500. Sylvia did not have the money with her. Lena said to bring it to the place where the abortion would be performed. Lena gave her directions to go to the Barrel Inn at Vallejo where she was to meet a girl named Alice. Lena gave her one of Mr. Califro's professional cards on which Lena wrote the phone number. Lena told Sylvia to phone on leaving Walnut Creek to let Lena know she was on her way. Following directions, Sylvia, together with another woman who was to go also, met Alice Mareck at Vallejo. The three of them went then by bus to Woodland. Sylvia paid Alice $400. The other girl paid Alice $500. At Woodland they were met by Andrew and driven by him in

his car to either Yuba City or Marysville. In a house there Andrew performed the abortion.

### The Two Betty Counts.

Betty testified that in February she went to see Lena at her home, told her she was pregnant and asked if Lena could help her. Lena said "yes" and quoted a price of $500. Lena gave her Mr. Califro's professional card on which Lena wrote the house address and phone number. The following week she returned, with her nightgown and slippers which Lena had told her to bring. She was taken upstairs where she changed into her nightgown. In another room, Andrew performed the abortion while she was lying on a billiard table. (Califro admitted that there was a billiard table in the house.) She paid Alice the money.

In August, being again pregnant, Betty phoned Lena, telling her so. Lena said that she would try to get hold of the doctor and told her to call back. Betty phoned the next day and Lena said she had contacted the doctor. Betty said she only had $450. Lena said that he might do it for that. Lena told her to go by bus to Marysville and the doctor and Mary (Betty knew Alice as "Mary") would meet her there. At Marysville, Andrew and Alice met her, and took her to the house where the abortion was performed.

As to the Sylvia count and both Betty counts, Lena and her husband testified that they were not at the Califro home during any of the times testified to by the two women. Andrew denied aborting the women, claiming that his wife and the other man had rented a house in Yuba City and were performing abortions there.

### 1. The Indictments

A rather tenuous claim is made that the conspiracy counts in the two indictments do not charge crimes. ▇ The first indictment, first count, charges the defendants with conspiracy to commit abortion, committed as follows: Said defendants "during the three years last past and prior to the 12th day of January, A.D. nineteen hundred and fifty-two, . . . did willfully, unlawfully and feloniously conspire" etc. Then are alleged three overt acts, the paragraphs as to each overt act beginning: "That thereafter and pursuant to said . . . conspiracy" the particular act was performed. In the second indictment, first count, the conspiracy and four overt acts are alleged in the same manner, except that the conspiracy is charged as during the three years last past and prior

to the 15th day of February, 1951. Defendants contend that the overt acts are alleged to have occurred *after* the termination of the conspiracy. While perhaps the language used might have been clearer, it is clear that in saying that the defendants during three years last past and prior to a given date conspired, and that thereafter and pursuant to said conspiracy they did certain acts, the indictments are not stating that these acts occurred after the conspiracy was over. Defendants were fully informed that the conspiracy was charged to have continued until the given date and that the overt acts occurred pursuant to the conspiracy.

Defendants contend that the crime of conspiracy as charged in the second indictment was never proved for the reason that the evidence shows that all of the overt acts alleged occurred after February 15, 1951. As stated before, the indictment charged that the defendants "during the three years last past and prior to the 15th day of February, A.D. nineteen hundred and fifty-one, . . . did . . . conspire, combine, confederate, and agree together . . ." The overt acts are charged as occurring thereafter and pursuant to the conspiracy. There is nothing in the indictment to indicate that the conspiracy terminated on February 15, 1951. Moreover, if as claimed by defendants, the evidence showed the conspiracy and overt acts did not occur until after February 15, 1951, the mistake in the date is unimportant. ■ As said in *People* v. *Black,* 45 Cal.App.2d 87 [113 P.2d 746], it is immaterial upon what particular day any offense is charged in the indictment provided the evidence shows that the offense was committed within three years prior to the filing of the indictment. The evidence in our case shows that the formation of the conspiracies charged in both indictments and all acts connected therewith occurred within such a period. As to the contentions concerning the time charged in the indictments, the language in *Stern* v. *Superior Court,* 78 Cal. App.2d 9, 14 [177 P.2d 308]; is appropriate here. There it was contended that the indictment charging an offense as occurring the same day as the finding of the indictment failed to show whether it occurred before or after the indictment was found. The court said: "This point borders on the frivolous and we refuse to dignify it with extended discussion."

■ Defendants further contend that in California there is no such crime as conspiracy to commit an abortion. It is a little difficult to understand the contention made in this regard. Apparently defendants claim that abortion is not one

of the crimes mentioned in section 182 of the Penal Code, the criminal conspiracy section. Section 183 provides that no conspiracies other than those mentioned in section 182 are punishable criminally. While abortions are not mentioned in that section specifically, section 182(1) includes all crimes, felonies and misdemeanors known to the law of this state. "The first point raised by appellant that 'There is no such offense as conspiracy to commit the crimes of Burglary and Grand Theft' is fully answered by the decision in *People* v. *Welch*, 89 Cal.App. 18 [264 Pac. 324]." (*People* v. *Head*, 9 Cal.App.2d 647, 648 [50 P.2d 832].) Again, abortions would be included under section 182(5) which includes an "act injurious to . . . public morals. . . ."

2. EVIDENCE. (a) *Sufficiency*.

It is contended that as to Andrew and Lena there is no evidence of any agreement between them to commit abortions upon which a conspiracy could be predicated. ▪ There does not have to be direct evidence of such agreement—it may be inferred from other evidence—from the circumstances. ▪ Here the facts that the abortion arrangements were first made by the victims with Lena, and that following her instructions they were met by the aborter, constitute sufficient evidence from which such an agreement might reasonably be inferred. In the first Betty case the abortion took place at Lena's home and the price was paid Lena. It would be unrealistic and unreasonable to assume that Lena, Andrew and Alice did not have an agreement to commit abortions.

It is unnecessary to consider at length the claim that no part of any of the crimes except the first Betty abortion took place in San Francisco. It is sufficient to point to the actions of Toor and Lena as accomplices, all of which took place in San Francisco.

(b) *Corroboration*.

Section 1108 of the Penal Code requires corroboration of an abortee. (See *People* v. *Wilson*, 25 Cal.2d 341, 346 [153 P.2d 720].) ▪ So far as Andrew is concerned, in addition to other corroboration, his own admissions and confession establish ample corroboration. (See *People* v. *Baker*, 25 Cal. App.2d 1, 3 [76 P.2d 111].) ▪ The main contention is that there is not sufficient corroboration of the testimony of the abortees as to Lena. The testimony of Ann as to Toor's recommending Lena for abortion purposes, Toor's phone call

to an unnamed person for permission for them to come, his giving them a map showing how to get to the Califro home, was corroborated by Eppler; the paper containing the phone number which admittedly is in Lena's handwriting, Lena's admission that Ann came to her home asking for an abortion, the card given Sylvia on which Lena wrote the phone number and a similar card given Betty (although perhaps the handwriting on this is not Lena's) constituted corroboration for all of them. Betty was operated on on a pool table in the Califro home which admittedly was there. How would she know there was a pool table if she had not been there? Then again the testimony of each abortee showing the identical method and design is corroboration of the other abortees. An abortee is not an accessory or accomplice to the abortion. (*People* v. *Stone,* 89 Cal.App.2d 853, 869 [202 P.2d 333]; see, also, *People* v. *Clapp,* 24 Cal.2d 835 [151 P.2d 237]; *People* v. *Rhoades,* 93 Cal.App.2d 448, 451 [209 P.2d 33].) That abortions were performed on each of the women and that each became badly infected because of the abortion are shown by the medical testimony as to their condition immediately after the abortions. When Lena was brought to the hospital where Ann was recovering from the abortion and Ann identified her, Lena, who had denied knowing Ann, said to her: " '. . . when you came to the house, you said you wanted somebody to help you, and I told you I did not know anybody that could help you?' " Lena told Nelder that she had been to medical school in Europe, but denied writing "Dr. Lena" on the card which Ann testified Lena had given her. At the trial Lena admitted it was her handwriting. Her attorney conceded that it was.

Defendants apparently contend that Ann's testimony should be disregarded because it was given under threat of prosecution. On cross-examination she stated that while she had not realized there would be any reason to prosecute her, she had been told that if she testified nothing would be done against her. At most this would constitute a promise of immunity, a matter which the jury could take into consideration in weighing her testimony. The test of corroboration of an accomplice (and no more is required of an abortee) is whether the evidence other than such testimony by reasonable inference connects the defendant with the crime or whether it satisfies the jury that the accomplice is telling the truth. (*People* v. *Griffin,* 98 Cal.App.2d 1, 28 [219 P.2d

514

519].) "In determining the sufficiency of the other evidence necessary to corroborate an accomplice, 'there are certain established legal principles that serve as guides. ▮ It must "tend to connect the defendant with the offense," but "So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it 'be slight and, when standing by itself' entitled to but little consideration." [Citations.] ▮ The necessary corroboration may consist of inferences from the circumstances surrounding the criminal transaction. [Citation.] ▮ It need not establish the precise facts testified to by the witness whose testimony it supports. (*Ibid.*) ▮ It is not necessary that the corroborative evidence prove the defendant is guilty of the offense. [Citation.] ▮ Such evidence is sufficient if it connects the defendant with the commission of the crime in such a way as reasonably to satisfy the trier of fact that the witness whose testimony it supports is telling the truth. [Citations.] . . . ▮ *"Whether the corroborating evidence by itself is as compatible with innocence as it is with guilt, is a question for the trier of fact, not for the reviewing court."* (Italics added.) [Citations.]' (*People* v. *Kendall*, 111 Cal.App.2d 204, 210 [244 P.2d 418].)" (*People* v. *Wayne*, 117 Cal.App. 2d 268, 278-279 [256 P.2d 62].)

3. ADMISSION OF EVIDENCE. (a) *Pregnancy*.

Prior to 1935 section 274 of the Penal Code defining the crime of abortion required that as an ingredient of the crime the victim actually be pregnant. This requirement was deleted from the statute in that year. Defendants contend that because pregnancy is no longer an issue under the statute it was prejudicial error for the court to deny their motion to exclude all evidence of pregnancy. Yet at the same time they contend there is no evidence that Lena knew of the pregnancies or acted with intent to produce miscarriages, which intent the statute requires. ▮ While pregnancy is no longer an issue, it is a circumstance which may be proved, if it exists. The motion was properly denied. ▮ As to Lena's knowledge and intent, the circumstances amply afford reasonable inferences thereof. Why would she send the women who wanted abortions to "Doctor" Andrew who performed abortions, after first making the financial arrangements with them, if it was not with the intent that they be aborted? Moreover, one of the abortions was performed at her home.

(b) *Reference to 1939 Abortion.*

██ In describing the arrest of Lena, Inspector Nelder stated that after some conversation, he told her to come with him. Lena said, " 'For abortion? I don't do any abortions.' I [Nelder] said 'This is the same as in 1939.' " Defendants' motion to strike was denied. Nelder then testified: "She said, 'This is the same as in 1939. The cops picked me up for abortion and I was innocent at that time like I am now' and she talked about that case." Again a motion to strike was denied. On what theory the prosecution claims this conversation to be admissible does not appear. Obviously it was inadmissible and the motions should have been granted. However, in view of the strong evidence in the case it could not have been prejudicial. It is not reasonable to assume that in its absence, the jury would have acquitted Lena.

(c) *Andrew's Confession.*

██ Defendants contend that this confession should not have been admitted as the evidence demonstrates it was "not given free from inducement and reward." They base the claim on Andrew's testimony to the effect that when the officers came to his home at night to arrest him, he stated to Inspector Nelder that his wife was very ill (she was well enough two days later to come to San Francisco and surrender), the weather was inclement, and he insisted that his wife be not arrested. Nelder went to the phone, and, returning, told him that he had called the district attorney and he had told Nelder to use his own judgment. Then, as Nelder agreed not to arrest Alice in return for the confession, Andrew gave it.

Nelder denied any such statement by Andrew or that there was an agreement and stated that at the time of Andrew's arrest Andrew without any inducement admitted aborting Ann, giving the details. On returning to San Francisco Nelder stated to Andrew that the latter had formerly stated that he wanted to sign a confession. He then asked Andrew if he still wanted to do so and Andrew said he did. He was then asked if he wanted to write it in his own words or if he wanted Nelder to type it. Andrew then dictated the confession to Nelder and signed it when it was written.

The conflict between Andrew's and Nelder's versions of the circumstances of the confession was a matter for the jury to determine.

4. SEPARATE TRIAL.

█ Prior to trial Lena moved for a severance and separate trial on the ground, as set forth in her affidavit, that Alice had threatened to accuse Lena at the trial of the commission of the offenses charged unless Lena paid her a large sum of money; that Alice was under the protection of the police officers and had already, in order to avoid punishment for her own guilt, accused Lena of such complicity to them; that Lena believed that at the trial Alice would testify falsely against her codefendants and that Lena could not have a fair trial joined at trial with Alice. The motion was denied. How this could constitute an abuse of discretion does not appear. The effect of Alice's testimony against Lena would be the same whether in a joint or separate trial. While Alice pleaded guilty during the trial she did not testify. The granting of separate trials is a matter in the discretion of the court. We can see no abuse of that discretion here. As said in *People* v. *Nasworthy,* 94 Cal. App.2d 85, 92 [210 P.2d 83], "There was a common element of substantial importance in the commission of the conspiracy charged, and the acts with which" Lena was charged—"all involved one set of circumstances." Even in cases where certain evidence is admissible only against one defendant and not the other, it has been held that there is no abuse of discretion in denying the other a separate trial. (*People* v. *Eudy,* 12 Cal.2d 41 [82 P.2d 359].)

The judgments of conviction and the orders denying motions for new trials are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 16, 1953, and appellants' petition for a hearing by the Supreme Court was denied October 29, 1953.