[Crim. No. 5350.   Second Dist. Div. Three.   Sept. 21, 1955.]

THE PEOPLE, Respondent, v. CECIL BOWLBY, Appellant.

William V. Krowl for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

ASHBURN, J. pro tem.[*]—Defendant was tried and convicted upon an information charging in Count I the crime of abortion (Pen. Code, § 274) and in Count II attempted abortion (Pen. Code, §§ 274 and 664). Trial was had without a jury pursuant to specific waiver. Motion for new trial and application for probation were duly made and both were denied. Defendant was sentenced to state prison for the term prescribed by law for the crime of abortion (two to five years) and one year in the county jail for attempted abortion, this latter sentence to run concurrently with the state prison sentence. Defendant appeals from the judgment and the order denying a new trial. The principal contention with respect to each count is that the corroboration of the testimony of the woman upon whom the abortion was alleged to have been committed or attempted is legally insufficient and hence the evidence will not sustain a conviction.

Although the aborted woman is not an accomplice (1 Cal.Jur.2d § 5, p. 154), section 1108, Penal Code, says: "Upon a trial for procuring or attempting to procure an abortion . . . the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence." Speaking of corroboration of an accomplice (essentially the same question as here), the court said in *People* v. *Griffin*, 98 Cal.App.2d 1, 27, 28 [219 P.2d 519] : "The word 'corroboration' in its etymological sense denotes 'a strengthening or confirming.' (Webster's New Internat. Dict., 2d ed.) It is essentially a relative term and refers to some antecedent which it is said to strengthen or fortify. The jury in determining the question of corroboration must obviously compare the residue of the other evidence with the accomplice's testimony, in order to ascertain the truthfulness of the latter, and in this regard the corroborative evidence must do more than merely raise a suspicion of guilt, even a grave suspicion, in the jury's mind. It must reasonably satisfy the jury that the accomplice is telling the truth." The quantity and quality of the necessary corroboration in

---

[*]Assigned by Chairman of Judicial Council.

a case of this kind is defined in *People* v. *Gallardo,* 41 Cal.2d 57, 62, 63 [257 P.2d 29]: "Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman is telling the truth. [Citing cases.] It has been held that the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense. [Citing cases.] It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself. [Citing cases.]" To same effect are *People* v. *Malone,* 82 Cal.App.2d 54, 60-61 [185 P.2d 870]; *People* v. *Griffin,* 98 Cal.App.2d 1, 25-28 [219 P.2d 519]; *People* v. *Allen,* 104 Cal.App.2d 402, 411-413 [231 P.2d 896]; *People* v. *Morris,* 110 Cal.App.2d 469, 476 [243 P.2d 66]; *People* v. *Kendall,* 111 Cal.App.2d 204, 210 [244 P.2d 418]; *People* v. *Califro,* 120 Cal.App.2d 504, 513-514 [261 P.2d 332].

As this question of sufficiency of corroboration goes essentially to that of sufficiency of the evidence to sustain the conviction, a review of the evidence herein must be governed by familiar rules. "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt, is established beyond a reasonable doubt. . . . The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference

with the determination of the jury.'' (*People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911].) See also *People* v. *Gutierrez*, 35 Cal.2d 721, 727 [221 P.2d 22] ; *People* v. *Hatton*, 114 Cal.App.2d 195, 196 [249 P.2d 901]. We therefore adopt in our statement of facts that evidence which tends to support the judgment rather than any conflicting testimony which was designed to prevent such a result.

Defendant is a licensed chiropractic, conducting an office and a small hospital in Los Angeles. Betty C. Burton, at the time here pertinent, was a married woman separated from her husband and working at a job which attached her to the United States Naval Hospital at Vallejo, California. Having been advised by a physician, after a pregnancy test had been made, that she was pregnant, she and her friend, Robert Foster, a student, traveled in her car from Vallejo to Los Angeles to see defendant Bowlby. On April 5, 1954, Foster drove her to defendant's office and waited in the car while she went inside and conversed with Dr. Bowlby. Having made an appointment to return next day she returned to the car and Foster, and they drove away. Foster corroborates this, except as to what occurred inside defendant's office. Mrs. Burton testified that on that occasion she told defendant that she was in the family way, was unable to have a child at that time, and asked whether he could assist her; that he said he could; when asked how he would perform the abortion, he said he used a jelly which he inserted into the uterus, that it caused a pressure which in turn would produce an abortion. Asked the cost, defendant said it would be $300 in cash; she said she would bring it the next morning and an appointment was made for 9 a. m. on the 6th of April. Defendant himself testified that he told her to bring the $300. Foster testified that he brought Betty to the office to keep that appointment on the 6th, but he did not leave the car; she went inside. In effect she said the same thing.

According to her testimony she gave the doctor $300 in currency, was then taken by him into a small room, told to undress, wrap herself in a sheet and wait until the arrival of his nurse. This she did. At about 10 a. m. the nurse took her to another room where she was placed on a table with her feet in stirrups, and defendant worked on her for about a half-hour. He was seated in front of her. She saw on an instrument table a syringe and a cannula, a tube similar to an exhibit shown her (marked ''lubricating jelly'') which

had the same odor as a bottle shown her bearing the label "Dr. Bowlby's Seaweed Oil Antiseptic"; also two uterine forceps. Defendant inserted a vaginal speculum in her; she felt jelly go into her uterus, followed by the placing of a tampon; immediately she felt internal pressure. Defendant told her it would be about 24 hours before she would expel the fetus. She then returned to another room and stayed there overnight. The nurse did not testify and defendant's version was that of necessary evacuation of the uterus in order to save the patient's life, an explanation which the trial judge did not find credible. Of course there could be no direct corroboration of Betty Burton's account of the abortion procedure, but there is indirect corroboration, some of which came from defendant. As will later appear this is the same procedure that was described by defendant to Billie Greene, the complaining witness on Count II. ■ It appears that the instruments and appliances which Burton saw on that occasion have legitimate uses in the hands of a physician other than abortion, but their assemblage within easy reach of a doctor who is attending a woman whose health is good except as affected by existing pregnancy,[1] becomes evidentiary of an unlawful purpose. See *People* v. *Vosburg,* 123 Cal.App.2d 535, 536 [266 P.2d 927]; *People* v. *Raffington,* 98 Cal.App.2d 455, 461 [220 P.2d 967]; *People* v. *Morris,* 110 Cal.App.2d 469, 477 [243 P.2d 66]; *People* v. *Powell,* 34 Cal.2d 196, 201 [208 P.2d 974]; 1 Cal.Jur.2d § 26, p. 173.

■ After considerable questioning of defendant by the police, Investigator Ross said to him: " 'Dr. Bowlby, you are charged with the actual abortion upon the person of Betty Burton, that you used these instruments in terminating her pregnancy; that you packed her with an ointment jelly under pressure; that she paid you three hundred dollars for the abortion, and that you took the money.

" 'Also, you attempted an abortion on the person of Billie Greene and you were paid three hundred dollars to do that. The money was found in your possession. Now, Doctor, what do you have to say about this?' " Defendant remained silent. His reaction to such accusatory statements was corroborative of the abortee's testimony. (*People* v. *Davis,* 43 Cal.2d 661, 670 [276 P.2d 801]; *People* v. *Simmons,* 28 Cal.2d 699, 712-715

[1]Her testimony as to her good health needed no independent corroboration. (*People* v. *Gallardo,* 41 Cal.2d 57, 62 [257 P.2d 29]; *People* v. *Malone,* 82 Cal.App.2d 54, 61 [185 P.2d 870].)

[172 P.2d 18]; *People* v. *Ramsey*, 83 Cal.App.2d 707, 724 [189 P.2d 802]; 1 Cal.Jur.2d § 28, p. 177.)[2]

Betty Burton described her sufferings through the night of the 6th and most of the day of the 7th of April, but direct corroboration does not appear until about 11:45 a. m. on the 7th when Foster arrived; he testified that he saw defendant, asked how Betty was, found she was not ready to leave, and asked if he could stay with her; defendant said he could. He then stayed about five and a half hours with her. She testified that the internal pressure was so intense she had to go to the bathroom every 15 or 20 minutes while Foster was there. He said he helped her out of bed a couple of times and she went to the bathroom several times. Betty Burton said that at 5 o'clock she went to the bathroom, felt some blood, and saw the fetus, whereupon she called Dr. Bowlby, who came in, examined the fetus and said, "That is it." Foster testified that he called defendant to the bathroom at about 5 p. m. and then went back to the room where he had been. Burton said she asked the doctor whether she should stay there or leave and he said she could leave; that she dressed, and Foster took her to a motel where he could take care of her; that they left the Bowlby place about 5:30 p. m. Foster said that he asked defendant whether Betty should stay there and he said she was all right to leave; that they left together at 5:30. Mrs. Burton said she went back next day, as directed by defendant, and he then washed her out with some solution. Next she appears to be in a hospital in Burlingame on or about April 15th; Foster was with her and being interviewed by representatives of the State Medical Board or the district attorney.

On April 23, 1954, Mrs. Billie Greene (prospective abortee) and Kenneth Kloster (both representatives of the State Medical Board) called at defendant's office. Kloster introduced himself as Ken Johnson and gave Billie Greene's correct name; said they were friends of Betty Burton and she had sent them. Defendant said, "Yes, she phoned and told me."

---

[2]Defendant testified that he was in custody of the police some 12 hours before he was booked and subjected to much questioning; that he asked to see an attorney many, many times, a hundred times, and was constantly refused; that he was denied a telephone call until almost midnight, having been arrested shortly after 9 a. m.; that he refused to answer questions until he had legal counsel. All these matters, if believed, would go to the admissibility and the weight of the evidence, but the question was one for the trial judge. (*People* v. *Simmons*, 28 Cal.2d 699, 718-721 [172 P.2d 18].)

As Kloster phrased it, defendant said, "Yes. I have been expecting you." Mrs. Greene testified her health was fine and she was not pregnant. But Kloster told Dr. Bowlby that she was pregnant about six weeks, according to his testimony; and defendant said that is just about right. Greene testified that defendant said he understood she was about six weeks pregnant. Also that Kloster said he understood abortions were dangerous and Bowlby replied there wasn't anything to be afraid of; that Kloster asked what his treatment was and defendant told them he packed the uterus with an ointment, she would feel a soreness and a pressure and would lose the fetus between 24 and 48 hours. Kloster testified to the same effect. Greene testified that defendant said the ointment came from back east from a company that had closed down and he had just a small amount left for a few more jobs. Kloster corroborated, and defendant admitted on the stand that he had said that. He also testified that Greene told him she was pregnant and was referred to him to be taken care of. Greene, Kloster and Dr. Bowlby testified that Kloster asked the charge and defendant said $300. Kloster added that defendant also said, "I will take the money now"; that he handed the doctor fifteen $20 bills (whose serial numbers he had recorded in advance); Bowlby also said he received the $300 in advance. His explanation of exacting payment in that manner was hardly convincing. "THE COURT: Did you make any arrangements, financial arrangements then? THE WITNESS: I did at that time, yes. THE COURT: Did you take any money from her? THE WITNESS: I did. THE COURT: How much? THE WITNESS: $300. THE COURT: Well, had you examined her up to that time? THE WITNESS: I had not. THE COURT: Well, then, what were you taking the $300 for if you hadn't examined her up to that point? THE WITNESS: For work that might follow after examination. THE COURT: Is that the way you charge your patients? THE WITNESS: They pay an advance fee, admittance fee, anywhere from $300 to $500 when I admit them. THE COURT: Without your knowing what is wrong with the individual or whether or not the individual is pregnant you take the $300 in advance, is that right? THE WITNESS: That is right. Admit them into the hospital and all examinations are made afterwards and refunded if not needed."

After completion of this preliminary the nurse took Mrs. Greene to a small room, told her to disrobe and put a sheet

around her. This she did, then asked if Kloster could come in with her. The nurse brought him in. In a few minutes defendant himself took Greene into another room. Kloster corroborates this. Greene says she was then told to get on a table, that she did so and placed her feet in the stirrups. She saw a speculum like the one in evidence, a syringe (without a cannula attached), a tube of jelly like the exhibit. The defendant seated himself in front of her, put on rubber gloves and examined her uterus, she felt him touch it; next he picked up a syringe similar to the one in court, and she then called Kloster who rushed in and saw that defendant was seated in front of Mrs. Greene, wearing rubber gloves and applying a lubricant to a vaginal speculum, one which was seized and later received in evidence. Of course, there was no one in the room but Greene, Bowlby and the nurse up to the point where Kloster was called in.

Two other officers were also brought in. As related by Kloster, they saw and seized, as an incident to defendant's arrest, a vaginal speculum, syringe and cannula, tube of lubricant, two uterine forceps, two whiskey glasses and two green bottles, a piece of gauze with string attached, two gray metallic colored tubes, all of which were received in evidence. These instruments and other items, though individually usable for lawful purposes, when assembled within easy reach of one engaged in what appears to be an abortion, speak affirmatively of an unlawful intent. See cases cited *supra, People v. Vosburg et al.* Investigator Ross asked defendant where the money was that had just been paid him; he said, ''I do not have it on me''; Ross told him he had better produce it or Ross would have to search until he found it; Dr. Bowlby then led Ross and Kloster to the office and took a yellow envelope out of a desk drawer and extracted from it the fifteen $20 bills which Kloster had previously delivered to him, having previously recorded the serial numbers (this according to the testimony of Kloster). ■ Kloster was doubtless an accomplice but that did not disqualify him as a corroborating witness. (*People* v. *Gallardo, supra,* 41 Cal.2d 57, 63; *People* v. *Malone, supra,* 82 Cal.App.2d 54, 68.)

■ It will have been observed that the pattern followed in the Burton and Greene procedures was the same, as initially explained to each by defendant and as followed in the operating room. This makes each abortion or attempt corroborative of the other and each of the women's testimony corroborative of that of the other. (*People* v. *Gallardo, supra,*

41 Cal.2d 57, 63; *People* v. *Malone, supra,* 82 Cal.App.2d 54, 63; *People* v. *Allen, supra,* 104 Cal.App.2d 402, 411; *People* v. *Green,* 111 Cal.App.2d 794, 797 [245 P.2d 526]; *People* v. *Califro, supra,* 120 Cal.App.2d 504, 514; *People* v. *Kendall, supra,* 111 Cal.App.2d 204, 211.)

▓ Though defendant testified at the trial in his own behalf, he was not asked and did not volunteer any information about the second count. The subject was opened by the trial judge without objection. In the face of testimony introduced by the prosecution that defendant had been arrested while in the actual attempt to commit an abortion upon Billie Greene, this failure to undertake an explanation while on the witness stand is significant. (*People* v. *Steccone,* 36 Cal. 2d 234, 239 [223 P.2d 17].) In *People* v. *Adamson,* 27 Cal.2d 478, 490, 491 [165 P.2d 3], it is said: "The jury, however, is concerned with the scope and nature of the consideration that it may give defendant's failure to explain or deny incriminating evidence, and in the present case should have been instructed that the defendant's failure to deny or explain evidence presented against him does not create a presumption or warrant an inference of guilt, but should be considered only in relation to evidence that he fails to explain or deny; and that if it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." The fact that counsel may have stood upon supposed insufficiency of the prosecution's case, goes to the weight of the inference rather than its existence or its competency.

It cannot be said as matter of law that there was insufficient corroboration on either count. On the contrary the corroboration cumulatively was such that the trial judge was warranted in concluding that "it tends to connect the defendant with the commission of the crime in such a way" as to satisfy the trier of the facts "that the woman is telling the truth." (Quoting *People* v. *Gallardo, supra,* 41 Cal.2d 57, 62.)

It is argued that the evidence as to Count II (Greene) showed only preparation and not an attempt to commit an abortion. ▓ "In order to establish an attempt, it must appear that the defendant had a specific intent to commit

a crime and did a direct, unequivocal act toward that end; preparation alone is not enough, and some appreciable fragment of the crime must have been accomplished." (*People* v. *Gallardo, supra,* 41 Cal.2d 57, 66.) The test to be applied is whether defendant has done some act which unequivocally manifests an existing intention to go forward to completion of the crime thus begun. *People* v. *Berger,* 131 Cal.App.2d 127, 130 [280 P.2d 136], quotes *People* v. *Miller,* 2 Cal.2d 527, 531 [42 P.2d 308, 98 A.L.R. 913], as follows: " 'The reason for requiring evidence of a direct act, however slight, toward consummation of the intended crime, is, as pointed out by the author in Wharton's Criminal Law, that in the majority of cases up to that time the conduct of the defendant, consisting merely of acts of preparation, has never ceased to be equivocal; and this is necessarily so, irrespective of his declared intent. It is that quality of being equivocal that must be lacking before the act becomes one which may be said to be a commencement of the commission of the crime, or an overt act, or before any fragment of the crime itself has been committed, and this is so for the reason that so long as the equivocal quality remains no one can say with certainty what the intent of the defendant is.' " ██ The evidence at bar shows that defendant had made a bimanual vaginal examination of Mrs. Greene, duplicating the first act in the Burton abortion, and that at the time of arrest he was preparing the vaginal speculum for use in Mrs. Greene, thus repeating the second movement of the Burton crime. The trial judge was justified in concluding that defendant· had committed himself unequivocally to an abortion upon Greene, which was interrupted only by the arrest. In *People* v. *Raffington, supra,* 98 Cal.App.2d 455, 459; *People* v. *Reed,* 128 Cal.App.2d 499, 501-502 [275 P.2d 633]; and *People* v. *Berger, supra,* 131 Cal.App.2d 127, 128, 130, acts of less positive significance than those shown at bar were held to constitute an attempt rather than mere preparation, to be "some appreciable fragment of the crime . . . accomplished" as required by Gallardo, *supra.*

██ Appellant further contends that the evidence in support of the second count (Billie Greene) shows an entrapment of defendant. ·It is essential to such a defense that the criminal intent originate with the one who is alleged to have entrapped defendant and that the crime be induced by him through persuasion or the like. His merely furnishing the occasion for one engaged in illegal activities to ply his trade

does not amount to entrapment. *People* v. *Braddock,* 41 Cal. 2d 794, 802 [264 P.2d 521]: ''The many decisions in this state which define the defense of entrapment were reviewed in *People* v. *Lindsey,* 91 Cal.App.2d 914 [205 P.2d 1114], and the law stated as follows: 'Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense. (Citations.) If the officer uses no more persuasion than is necessary to an ordinary sale, and the accused is ready and willing to make the sale, there is no entrapment.' (P. 917.) More recently it was held: 'It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers is what is condemned and will not be tolerated. Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he committed a crime raises no inference of unlawful entrapment.' '' *People* v. *Terry,* 44 Cal.2d 371, 372 [282 P.2d 19]: ''As to the first contention, 'entrapment ''is a positive defense imposing upon an accused the burden of showing that he was induced to commit the act for which he is on trial'' [citing cases]. ▉ Entrapment as a matter of law is not established where there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused.' '' And the question is one of fact for the trial court's determination (*Id.* at p. 375). The defense was properly rejected here.

Without making a separate point of it in the brief or presentation of any authorities, counsel for appellant asserts at the end of his brief that defendant was denied the right to counsel, his home and privacy were invaded and he was interrogated for hours at the police department before he was booked; that he was examined against his will and the questions asked were used against him. It appears that he was fully represented by counsel from time of arraignment until the present. ▉ Any statements made by him before he obtained counsel were received in evidence without objection; for the most part they consisted of refusals to answer questions; they were not essential to the proof of the prosecution's case, as appears from the foregoing discussion of the

evidence. No prejudice to defendant has been shown even if his testimony be accepted at par, a thing which the trial judge obviously did not do. The evidence does not support the claim of an unlawful invasion of his home or privacy.

None of the points urged by appellant's counsel is meritorious. The judgment and order are affirmed.

Wood (Parker), Acting P. J., and Vallée, J., concurred.