[Crim. No. 16.    Fifth Dist.    Jan. 17, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ESTHER MAY HELWINKEL, Defendant and Appellant.

Keough & Cali, Richard T. Tosaw and William J. Keough for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

STONE, J.—Esther May Helwinkel was indicted for the murder of her husband, Lawrence R. Helwinkel. A jury trial resulted in a conviction of murder in the first degree, and pursuant to a verdict fixing the penalty, defendant was sen-

tenced to life imprisonment. She appeals from the judgment and from an order denying a motion for a new trial.

The facts must be stated at some length because defendant's conviction rested largely on circumstantial evidence, and the numerous events relating to her husband's death by poison cover a period of several months. On January 12, 1959, Lawrence R. Helwinkel was unmarried and a foreman of the Armour poultry plant at Turlock, California. He applied for membership in the World-Wide Group, a lonely hearts correspondence club, representing that his income was $3,000 a year, that he owned his own home and an automobile, that he had never been married, and that he never used intoxicating liquor. In describing the type of person of the opposite sex in whom he was interested, he stated, "I would like to meet a woman who doesn't drink, but one who wants a good home and would make a pleasant companion."

In February 1959, defendant met the deceased through the lonely hearts club. After corresponding for awhile, defendant telephoned Helwinkel and asked if she could visit him. When he agreed, she drove to his home in Turlock; they were married May 6, 1959. Soon after the marriage Helwinkel became aware of defendant's drinking habit and that sometimes she indulged to excess. It was necessary upon one occasion to place her in the Livermore Sanitarium for treatment as an alcoholic, and on several occasions a doctor was called to treat her at her home. At the request of defendant, neighbors also called a doctor to treat her for intoxication. One of her neighbors testified that "she always got so bad that she was lying down."

The deceased told a doctor who was called to treat defendant for intoxication that he was concerned about her condition, that he did not know how to cope with the problem, and that prior to the marriage he knew nothing about her drinking. The husband told neighbors that he was not going to put up with defendant's drinking, that he could not tolerate it, and that it was making him look ridiculous in the community. He also stated that under the circumstances he could not keep defendant with him and that he was going to have her leave.

Helwinkel was apparently in good health on July 23, 1960, when he and defendant had dinner at a restaurant. While returning home, he became so violently ill with stomach cramps that he was forced to stop the car and vomit. The following evening he was again ill with nausea and vomiting,

and a Dr. Meade was called. Defendant told the doctor that the previous day her husband had sprayed the garden with a chemical called Dowpon. The doctor checked with a poison center in Oakland and was informed that the illness could not have been caused by any poison in Dowpon. Helwinkel continued to lose weight from vomiting, he also became dizzy and fainted. Because he had no previous history of such occurrences, the doctor placed him in a hospital on July 26. During hospitalization his condition improved.

On July 30, defendant asked a neighbor, Mrs. Littler, to come to her home. When the neighbor arrived, she discovered that defendant was so drunk that she was in bed, "real bad off." The neighbor called a doctor at defendant's request. The doctor stated that he would have the husband released from the hospital the next morning so that he could take care of defendant. Helwinkel returned from the hospital on July 31, and defendant was drunk when he arrived home. Several days later defendant again called her neighbor, Mrs. Littler, between 10 and 12 at night. She told Mrs. Littler and her daughter, Mrs. Hall, that she did not know what she was going to do, that her husband wouldn't talk to her, and that he was going to get rid of her because of her drinking. Defendant told them that she could not take it any more. When the neighbor suggested that she leave, defendant replied that she could not as her husband had everything and that she had no place to go. During the conversation defendant confided to them that she had thought of killing her husband and herself, then added, "I have the stuff to do it." When the neighbor finally informed defendant that she and her daughter must be going home as they could not stay all night, defendant declared, "Go ahead, then, nobody cares what happens, and I will go in and finish what I started. You will never see us again." She also said, "Well, just go on—go on home. I'm going to finish what I have started. I am going to give him the stuff and take it myself and you won't see us anymore."

The following morning Mrs. Littler went to defendant's home to see if she was all right. When Mrs. Littler let her know that she was concerned about some of the things defendant had said the night before, defendant replied, "Well, I still have such awful thoughts, that I still feel like killing him and killing myself."

On August 2, Helwinkel visited his doctor and was found to be weak but fairly well. Although he was able to work August 8, he gradually began to degenerate physically. He

became weaker and weaker, he lost the use of his hands and feet, and he could not climb ladders. He had difficulty operating the equipment which he had formerly manipulated with ease, he could not write in his book, he could not take a cigarette out of a package and light it, and he eventually lost the use of his hands completely. On August 22 he complained to his doctor that his hands and feet had been numb for two weeks, and that it had been necessary for him to use woolen stockings at night to keep his feet warm. His blood pressure was elevated for the first time. September 1 the doctor observed that the fingers were not only numb, but painful, and that the blood pressure was still elevated. The doctor, becoming alarmed, arranged to have Helwinkel admitted to the University Hospital. Defendant then arranged for herself and her husband to consult with an attorney, this being September 8. They kept the appointment, and wills were prepared for and executed by both of them. The day after the execution of the wills, September 9, Helwinkel was admitted to the University of California Hospital.

Following Helwinkel's admission to the hospital, defendant and her sister-in-law were discussing his condition and his illness caused by food poisoning. Although arsenic had never been mentioned, defendant said, ''You know, Elsie, arsenic can't kill a person.'' On September 17, while Helwinkel was still in the University of California Hospital, defendant was stopped by police in San Jose for driving while intoxicated. She asked the officer for a break because her husband was dying and did not have much longer to live. The officer tried to encourage her by pointing out the advances made in medical science, which meant there was a good possibility that her husband would be saved. Defendant replied that she knew her husband was dying, and that the doctors could not do anything for him.

On October 5 deceased returned home, and by October 26 his condition appeared to have improved considerably. However, on November 2, his feet were burning again and bothering him at night and he stated he felt as though there was a tight elastic band around his knees, and that his feet slapped as he walked. His hands were stronger, but still numb. On November 7, a Mrs. Roberts visited defendant and deceased at their home, and had dinner with them. After dinner, deceased became ill and vomited, and did so three different times while Mrs. Roberts was there. On this occasion deceased asked defendant if she had put pepper in his salad. The following day,

November 8, a doctor visited deceased, as he was suffering pains in the pit of his stomach and over his gall bladder. He also was dizzy, faint, and experienced a feeling of thirst. During the afternoon of November 9, a former fellow-employee visited deceased, and found him unable to walk without supporting himself on pieces of furniture, he was weary, his face drawn, and his skin pale. During the visit deceased suffered diarrhea and also vomited severely on one occasion.

On November 11, the doctor visited deceased, and found him complaining of nausea and weakness from vomiting for three or four days. He walked with difficulty. Defendant told the doctor that her husband complained that ''every time he eats something and gets this way, he blames it on something he's eaten just prior to the episode of nausea and vomiting.'' The treatment prescribed by the doctor failed to improve his condition. On November 12, defendant called the doctor and informed him that her husband was very ill, but she demurred to the doctor's request that she take him to a hospital. At approximately 1:45 on the morning of the following day, November 13, defendant again called the doctor, who ordered an ambulance. Helwinkel was taken to the hospital; the doctor described his condition as ''very shocking.'' He was writhing with pain and complained of severe pains in his abdominal region. His pulse was rapid, he was placed in an oxygen tent and given medication to raise the blood pressure, but he died shortly thereafter.

Mrs. Russo, a neighbor of defendant, arranged to have her mother stay at defendant's home the night Helwinkel died. Mrs. Russo testified that before defendant left for the hospital she gave the following instruction: ''She asked me to tell my mother not to touch anything that Lawrence might have eaten from the refrigerator.''

Defendant entered deceased's hospital room after his death, but left shortly, approached the attending physician and said, ''You are not going to order an autopsy of Lawrence after all he's been through?'' Until this time there had been no suggestion by the doctor or by anyone else that an autopsy should be performed. The doctor informed defendant he was not fully convinced whether an autopsy was indicated, saying, ''Well, I just don't know what the cause of his death was and I just don't see how I can avoid it.'' After this initial comment, defendant brought up the subject of an autopsy several times, and tried to convince the doctor that he should not order one.

An autopsy was performed, and it revealed as the cause of

death, shock due to arsenic poisoning. Arsenic was discovered in the contents of the stomach, and in both the base and tip of the victim's toenails, in the brain, stomach wall, hair, liver, fat, heart and kidneys of the deceased. It was the opinion of the autopsy surgeon, based upon the amount of arsenic in the body and its distribution throughout the body, that the victim had continually ingested arsenic over a period of three or four months, and that a fatal dose of arsenic had been administered within hours of the victim's death. The doctor was positive that it was impossible for deceased to have been poisoned by inhalation or absorption through the skin.

Jesse Carr, M.D., a pathologist of many years' experience, whose qualifications were not questioned, testified as follows:

"Q. Now, from the facts which I gave to you, can you state whether the death was the result of acute, subacute or chronic poisoning? A. I can answer that question if I may explain the answer.

"Q. Yes. A. He actually died of all three. The immediate cause of his death on the 13th of November was acute arsenic poisoning, but in his background he also had subacute and chronic arsenic poisoning.

"Q. Now, would you explain the difference, first of all, Doctor, between chronic, acute and subacute arsenic poisoning? A. Yes. May I just refer to the words? First, chronic in a poisoning sense is a matter of months and subacute poisoning runs from, generally a month, down to a matter of a few weeks, and acute poisonings are those which terminate within twenty-four to forty-eight or at most seventy-two hours in the case of arsenic. Occasionally an acute poisoning will last as much as six to seven days. Now, to distinguish between these three: Arsenic is one of the few poisons that medical scientists get satisfaction working with because arsenic writes its own record after it is ingested or eaten or in fact any way that it may be taken, and it leaves specific evidence, so it is one of the rare things we study that we can time and that is why I say that there are all three elements here. . . ."

Just a little over two weeks later, on January 28, defendant contacted another lonely hearts club, and on January 31 she reenrolled as a member of the World-Wide Group, the lonely hearts club through which she had met deceased.

Defendant raises two principal grounds of appeal, first, that it was error to admit evidence of defendant's habit of drinking to excess; and second, that the evidence was insufficient to support the jury verdict of guilty.

Taking up the first ground of appeal, defendant makes three arguments in support thereof. She contends, (a) that her drinking constituted character evidence and as such could have been admissible only had she first introduced evidence of her good character, which she did not do; (b) that the evidence of chronic alcoholism tended to show a disposition to commit the crime of murder, for which purpose it was inadmissible; (c) that the evidence of drinking included an arrest for driving while intoxicated, which constituted evidence of a crime other than that for which defendant was being tried, which was inadmissible. Defendant cites several cases holding that the prosecution cannot introduce evidence of bad character in its case in chief. ■■■ This general proposition of law is correctly stated, but it is equally well established that evidence disclosing bad character traits but otherwise relevant is nevertheless admissible to prove motive, malice, intent, knowledge or common plan or scheme. The question of relevancy, rather than disclosure of bad character traits, controls the admissibility of such evidence. In *People* v. *Mullen*, 115 Cal.App.2d 340 [252 P.2d 19], testimony concerning the homosexual tendencies of the defendant was admitted in evidence to show motive. The case is a complete refutation of defendant's argument, as the court said, at page 343:

"'. . . the only question remaining is whether the abnormality of the relation was too highly prejudicial. In *People* v. *Hall*, 27 Cal.App.2d 440 [81 P.2d 248], a homicide case, where the plea was self-defense, it was held that motive is always material in such a case and any evidence having direct bearing on that motive is admissible however discreditably it may reflect upon defendant. In that case the decedent and defendant had been engaged in a homosexual relationship and this was the basis (not the motive itself) for the killing, the motive for which, properly speaking, was antagonism between the two parties growing out of their relationship. The court said, '(A)ppellant's voluntary declarations disclosing the prior immoral relationship not only served as competent evidence tending directly to prove motive and thus refute his claim of self defense, but that the matter of said immoral relationship became an important factor in the case to be considered by the jury in determining . . . malice . . . and that being admissible for the purposes mentioned, the fact that such evidence reflected prejudicially upon appellant's moral character did not, under the authorities cited, constitute legal grounds for its exclusion.' "

(See also *People* v. *Granados,* 49 Cal.2d 490, 494 [319 P.2d 346], and cases cited therein.)

In the case before us, proof of appellant's addiction to intoxicating liquors and the excessive use of them was offered not to picture her as a dissolute or degenerate person, but to establish motive. The evidence was relevant in that Helwinkel met defendant through a lonely hearts club, and in his application for membership he asked to be introduced to a woman who did not use intoxicating liquor. After the marriage he discovered that defendant not only used intoxicating liquors, but that she used them to excess. As one neighbor testified, she drank to the point where she "got lying down drunk." The evidence also disclosed that her husband placed defendant in a hospital at Livermore for treatment as an alcoholic, and that upon several occasions it had been necessary for him to call a doctor to treat her for alcoholism. The neighbors were called in upon several occasions because defendant was too drunk to care for herself. This evidence was relevant to the testimony that deceased expressed to several people his dissatisfaction with defendant's drinking; that defendant was embarrassing him in the community; that he was going to have to get rid of her, implying a divorce or annulment; that he was going to have to terminate the relationship because of the strain, embarrassment and financial drain upon him; and that he could no longer put up with her drinking. Equally important, the evidence discloses that defendant was well aware that her drinking met with her husband's dissatisfaction, indeed that it caused him distress. It is pertinent also to the evidence that defendant had no place to go and no money with which to provide for herself in the event her husband carried out his threat to terminate the marriage relationship.

Defendant's statements that she had thought about killing deceased, killing herself, and that she had the "stuff to do it with" were made at times when she was intoxicated. Certainly these statements were relevant, and the fact that defendant was intoxicated does not make the testimony inadmissible. Furthermore, Helwinkel's illness and the events leading up to his death covered a period of some four months, during which time defendant drank frequently, sometimes to excess. The husband's lingering illness from arsenic poisoning, his death, and defendant's intoxication were so inextricably interwoven that it would have been impossible, even aside from proof of motive, to present all of the relevant facts of the

case without disclosing appellant's use of intoxicating liquors.

Defendant's assertion that it was error to permit the prosecution to introduce evidence of her arrest for driving while intoxicated is equally untenable. If evidence is otherwise relevant, the mere fact that it also reveals that a defendant has committed another and a different crime does not make it inadmissible. This question is thoroughly but succinctly considered by Mr. Justice Peters, speaking for the Supreme Court in *People* v. *Sylvia,* 54 Cal.2d 115 [4 Cal.Rptr. 509, 351 P.2d 781], wherein he states, at page 119:

"While it is true that evidence of other crimes is generally inadmissible [citations], there are a number of exceptions to the rule. Thus, evidence of other offenses is admissible if material to the proof of the crime charged [citations], to show motive, intent or knowledge [citation], and to show a common plan or scheme [citation]."

(See also *People* v. *Brommel,* 56 Cal.2d 629, 634-635 [15 Cal.Rptr. 909, 364 P.2d 845]; 14 Cal.Jur.2d, Criminal Law, § 89, p. 279; *People* v. *Torres,* 185 Cal.App.2d 168, 170 [8 Cal. Rptr. 135].)

Defendant's second ground of appeal, that the evidence was insufficient to support the verdict of guilty, is advanced by two arguments: (a) "Circumstantial evidence must be irreconcilable with the theory of innocence before there is a sound basis for conviction"; and (b) "A conviction must be reversed if it appears that upon no hypothecation whatever is there substantial evidence to support the conclusion reached in the court below." Both arguments stem from the fact that defendant's conviction rested on circumstantial evidence.

We do not wish to unduly burden this opinion by quoting from decisions in other cases, but *People* v. *Scott,* 176 Cal.App. 2d 458 [1 Cal.Rptr. 600], presents an apt and scholarly analysis of both of the foregoing arguments advanced by defendant. It was said in the *Scott* case, at page 497:

"Our consideration of the contention that the evidence was insufficient to justify the verdict is governed by familiar rules. The decision of the jury as to material facts, and the inferences drawn therefrom, are to be accepted as conclusive on appeal if in our judgment they are such as could have been reached by impartial and reasonable minds. If there is room for difference of opinion among reasonable minds whether the facts impliedly found were justified by the evidence or whether the inferences drawn by the triers of fact were reasonable, we must accept their conclusions even though

as triers of fact we might have reached opposite ones. [Citations.]

"In our analysis of the evidence we have endeavored to find a reasonable theory of appellant's innocence. If we had reached the conclusion that such a theory does exist it would only have been incidental to the further question whether it was the only reasonable theory. The jury has determined that the evidence admits of no tenable theory of innocence. That determination is based upon the evidentiary findings of fact which the verdict implies. If those findings have support in facts established, and in reasonable inferences, they are conclusive on appeal. ■■■ 'After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it.' [Citations.]

■■■ "If we conclude that the implied factual decisions reached have substantial support in the evidence and that the inferences which led to the verdict were reasonably drawn, it is not our function to determine whether the ultimate findings were established beyond a reasonable doubt. That lies within the exclusive jurisdiction of trial judges and juries."

(See *People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Perkins*, 8 Cal.2d 502 [66 P.2d 63]; *People* v. *Bowlby*, 135 Cal.App.2d 519, 522 [287 P.2d 547, 53 A.L.R.2d 1147].)

■■■ Conviction of first degree murder was affirmed in the *Scott* case upon evidence more largely circumstantial than the evidence before us. The body of Mrs. Scott was never found nor was the cause of her death ever determined. In our case the body of Mr. Helwinkel was available for an autopsy, and the autopsy revealed that poisoning by arsenic was the cause of his death. Additionally, we have a record reflecting in detail the progress of Mr. Helwinkel's four-month illness preceding death. It provides a description of his activities, of his physical degeneration, of his nausea, of his medical and hospital treatment, and of his conversations with defendant and many other witnesses. There is also before us the testimony of defendant, as well as that of many witnesses who had conversations with her and who observed her and her actions.

The record which we have heretofore related in some detail reflects ample evidence, circumstantial though it may be, to support the verdict of the jury. There is substantial evidence from which the jury could, and did, reasonably conclude that

defendant had the opportunity, the means and the motive to kill her husband.

The many circumstances disclosed by the evidence not only point inexorably toward defendant as the murderess, but from the record we can perceive of no reasonable theory reconcilable with her claim of innocence. The only serious argument advanced by defendant to support her theory of innocence is that Helwinkel might have committed suicide. The instrument of death, arsenic poison, and the method by which it was administered, continual poisoning over several months, remove from the theory of suicide the probability required to bring it within the realm of reasonableness. The record shows without dispute that chronic, subacute and acute arsenic poisoning combined to cause Helwinkel's agonizing death. The poisoning occurred at intervals over a four-month period, and we find it difficult to believe that anyone bent on committing suicide would take repeated doses of arsenic and inflict excruciating pain upon himself time after time, rather than take a lethal dose and be done with it. The evidence of many episodes of vomiting and diarrhea accompanied by violent agony, the slow development of his disabling weakness, and the manner in which the use of his feet gradually became impaired until they slapped or dropped as he walked, dispel the theory of suicide.

It is equally unbelievable that a person would attempt to work and at the same time cause his body to degenerate. The deceased gradually lost the use of his hands while still on the job, getting so bad off that fellow employees had to remove his cigarettes from the pack and light them. It is significant that he continued trying to work even though he couldn't operate the machinery at the plant. This conduct is not consistent with suicide. His request for a doctor upon becoming ill, and going to the local hospital, are equally inconsistent with the theory of suicide. Nor does it appear reasonable that had he wanted to die he would have gone to the University of California Hospital for treatment by specialists when the cause of his illness could not be determined at a local hospital.

The judgment and the order denying a new trial are affirmed.

Conley, P. J., concurred.

Brown, J., deeming himself disqualified, did not participate.